Argued September 9, 1963, affirmed March 11, 1964

# VAUGHN *v.* LANGMACK

390 P. 2d 142

*W. A. Franklin*, Portland, argued the cause for appellant. On the briefs were Anderson, Franklin, Jones, Olsen & Bennett, Portland.

*Cleveland C. Cory*, Portland, argued the cause for respondent. With him on the brief were Rockwood, Davies, Biggs, Strayer and Stoel and Hugh L. Biggs and George H. Fraser, Portland.

Before ROSSMAN, Presiding Justice, and PERRY, SLOAN, O'CONNELL, GOODWIN, DENECKE and LUSK, Justices.

LUSK, J.

The plaintiff in this action for malpractice against a duly licensed physician and surgeon has appealed from a judgment for the defendant which followed a ruling of the court below sustaining defendant's demurrer to the complaint, based upon the ground that the action is barred by the statute of limitation.

As stated in the plaintiff's brief:

"The sole question presented by this appeal is whether a cause of action for medical malpractice, arising out of negligently leaving and failing to remove a surgical needle from plaintiff's body, accrues at the time of the negligent act, or at the time it was or might reasonably have been discovered."

The complaint alleged that on July 7, 1958, the defendant undertook to repair surgically a strangulated inguinal hernia from which the plaintiff was suffering; that after completing the repair the defendant

negligently failed to remove a surgical needle used in the operation and closed the incision in plaintiff's abdomen leaving the needle still there and that plaintiff experienced pain and bloating in the abdomen thereafter and did not discover the cause thereof until October 10, 1962. Thereupon it became necessary for him to submit to further surgery for removal of the needle.

This action was commenced January 9, 1963, about four and one-half years after commission of the alleged negligent act.

■ We affirm the judgment of the circuit court.

ORS 12.010 reads:

"Actions at law shall only be commenced within the periods prescribed in this chapter, after the cause of action shall have accrued, except where a different limitation is prescribed by statute. The objection that the action was not commenced within the time limited shall only be taken by answer, except as provided in ORS 16.260."

ORS 12.110 reads in part:

"(1) An action for assault, battery, false imprisonment, for criminal conversation, or for any injury to the person or rights of another, not arising on contract, and not especially enumerated in this chapter, shall be commenced within two years; provided, that in an action at law based upon fraud or deceit, the limitation shall be deemed to commence only from the discovery of the fraud or deceit.

"* * * * *"

It is not disputed that ORS 12.110 (1) applies to this case. But plaintiff contends that his cause of action did not accrue until he knew or should have known of the injury and that therefore the statute did not

commence to run until that time. We held otherwise in the similar case of *Wilder v. Haworth*, 187 Or 688, 213 P2d 797. We adhere to that decision.

The pertinent legislative history is of prime importance to the determination of the question before us.

The first statute of limitations was enacted in 1862. Deady, General Laws of Oregon, 1845-1864, Ch 1, Title II, p 140, section 3, read substantially as the present ORS 12.010. None of the numerous provisions which followed it prescribing time limitations for commencing various classes of actions contained any exception based on the time of discovery of the injury or the wrong. All such actions were barred unless they were commenced within a specified time "after the cause of action shall have accrued."

There was, however, such an exception applicable exclusively to suits in equity. Section 378, chapter 5, p 244, Deady, supra, provided that: "A suit shall only be commenced within the time limited to commence an action" but "[i]n a suit upon a new promise, fraud or mistake, the limitation shall only be deemed to commence from the making of the new promise, or the discovery of the fraud or mistake."

Section 6, ch 1, Title II, p 141, of Deady prescribed a six-year limitation for "[a]n action for criminal conversation, or for any other injury to the person or rights of another, not arising on contract, and not hereinafter enumerated." The statute was amended by Oregon Laws 1870, section 9, page 34, so as to make applicable to the actions just enumerated a limitation of two years. This amendment became a part of section 8, subdivision 1, L.O.L., and is now included in ORS 12.110 (1).

■ An action for malpractice is an action for an "injury to the person or rights of another, not arising on contract", and is governed by the provision just referred to.

These statutes were in effect without change when the cases of *Hood v. Seachrest,* 89 Or 457, 174 P 734, and *Schwedler v. First State Bk. of Gresham,* 92 Or 33, 179 P 671, were decided, the former on September 10, 1918, and the latter on April 8, 1919. Both were actions in deceit for fraud growing out of land sale contracts. The actions were held to be barred because they were not commenced within two years after the cause of action accrued.

In *Hood v. Seachrest* it was contended by the plaintiff that the statute did not commence to run until the discovery of the fraud. This court rejected the contention. After setting out the provisions of the statutes regarding law actions and those regarding suits in equity to which we have referred, the court said:

> "When we read these two sections together, it is obvious that the legislature intended that the rule adopted in law actions is to differ from the one followed in suits in equity. It will also be observed that while exceptions to the general effect of Section 3, L.O.L. were considered by the legislature, the Code is silent as to any exception in the case of fraud and deceit. This also is a convincing fact in the discussion. * * *" 89 Or at 462.

Section 3, L.O.L., was the same as section 3 in Deady, supra. The statement in the opinion in *Hood v. Seachrest* that exceptions were considered by the legislature evidently had reference to the following language of section 3, L.O.L., "except where, in special cases, a different limitation is prescribed by statute."

*Schwedler v. First State Bk. of Gresham* was decided upon the authority of *Hood v. Seachrest.*

With the decision of this court in *Hood v. Seachrest* before it and while *Schwedler v. First State Bk. of Gresham* was pending, though undecided, the legislature in 1919 adopted an amendment to section 8, L.O.L., so as to make that section read as follows:

"Sec. 8. Within two years:

"(1) An action for assault, battery, false imprisonment, for criminal conversation, or for any injury to the person or rights of another, not arising on contract, and not herein especially enumerated; provided, that in an action at law based upon fraud or deceit, the limitation shall be deemd to commence only from the discovery of the fraud or deceit.

"(2) An action upon a statute for a forfeiture or penalty to the state or county." (Oregon Laws 1919, ch 122.)

The amended statute became ORS 12.110 (1) and (2).

■ If a case of statutory construction ever called for the application of the maxim *expressio unius est exclusio alterius,* we have it here. The maxim is a compendious statement of a logical principle. As a recognized authority says: "[I]t is not of legal origin; rather it is a product of 'logic and common sense'." 2 Sutherland Statutory Construction (3d ed) 415, § 4916. Logic and common sense make unavoidable the conclusion that when the legislature, evidently prompted by the decision in *Hood v. Seachrest,* amended the statute in 1919 so as to provide that the time limited for bringing an action based upon fraud or deceit should commence to run only from the discovery of the fraud or deceit, it intended that, as to all other actions, the provision that the time com-

mences to run from the accrual of the cause of action should remain unchanged.

Similar considerations moved this court to hold in *Hood v. Seachrest* that, when the legislature provided that in suits in equity based upon fraud the time limitation should not begin to run until discovery of the fraud, but included no such provision in the statute governing actions at law, the legislature intended that as to the latter class of actions the time should begin to run when the cause of action accrued, not when the wrong was discovered.

It is, furthermore, obvious that the legislature considered that the phrase "after the cause of action shall have accrued" and the phrase "from the discovery of the fraud or deceit" mean different things; the plaintiff would make them mean the same thing.

■ "[I]t is a well established rule that in the construction of statutes, words used in the statute which have a well-defined legal meaning are to be given that meaning." *Cordon v. Gregg,* 164 Or 306, 311-312, 97 P2d 732, 101 P2d 414. See, also, *Reed et al v. Reed, Exec. et al,* 215 Or 91, 96, 332 P2d 1049; 2 Sutherland Statutory Construction (3d ed) 438, § 4919. The word "accrued" has a well defined legal meaning, certainly so when used in connection with an action for malpractice. That meaning was elucidated by this court in *Piukkula v. Pillsbury Flouring Co.,* 150 Or 304, 42 P2d 921, 44 P2d 162, 99 ALR 244. At page 324 the court stated the holdings in *Cappucci v. Barone,* 266 Mass 578, 165 NE 653, and *Ogg v. Robb,* 181 Iowa 145, 162 NW 217, LRA 1918C 981, two malpractice actions which we said applied the principle "that the cause of action arises, not when the entire scope of the injury has revealed itself, but when the tortious

act occurred." In the former case a physician had left a sponge in the abdomen of the plaintiff upon whom he operated. In the latter an injury caused to the plaintiff by the use of X-rays resulted in the ultimate development of cancer. Both actions were held to be barred by the statute of limitations, contrary to the contention that the statutes did not commence to run until discoverey of the injury. Respecting these decisions this court said:

"\* \* \* These two cases employed the general rule applicable to malpractice actions. See 15 Minn. Law Rev. 245. The same rule is employed in actions against attorneys, charging that they negligently performed their services. The time runs from the breach of duty. The cases are cited in Greenleaf on Evidence (16th Ed.) p. 410, footnote 4. In *Davis v. Boyett,* 120 Ga. 649 (48 S.E. 185, 66 L.R.A. 258, 102 Am. St. Rep. 118, 1 Ann. Cas. 386), the court, in holding that a father's cause of action for the seduction of his daughter arises when the act of seduction is complete, held:

" 'The father's *right* of action did not depend upon his knowledge of the great wrong which had been done [him] by the defendant. He had a right of action before he discovered the facts out of which it arose.'

"It concluded that his mere ignorance of the existence of the facts did not prevent the running of the statute of limitations. The rule employed in the cases above reviewed is of universal application except where the guilty party fraudulently conceals the existing cause of action. We quote from Wood on Limitations, (4th Ed.) § 179:

" 'In actions for injuries resulting from the negligence or unskillfulness of another, the statute attaches and begins to run from the time when the injury was first inflicted, and not from the time when the full extent of the damages sustained has been ascertained. The gist of the action is the neg-

ligence or breach of duty, and not the consequential injury resulting therefrom.'

See also Greenleaf on Evidence, (16th Ed.) § 433, and 31 Mich. Law Rev. 590, 'Undiscovered Fraud and Statutes of Limitation'." 150 Or at 325.

It was in accordance with the principles thus approved by this court that *Wilder v. Haworth* was decided in 1950. In 1957 the legislature amended ORS 12.110 (Oregon Laws 1957, ch 374), but it left untouched the language of that section here applicable, as theretofore construed by this court in the *Wilder* case.

We deem it unnecessary to enter upon a review of the decisions in other jurisdictions. The case of *De-Long v. Campbell,* 157 Ohio St 22, 104 NE2d 177, however, is so apposite that it should be noticed. This was an action for malpractice against a physician who, it was charged, negligently failed to remove a sponge which he had placed in the abdominal cavity of the plaintiff in performing an operation on her. Ohio had a one-year statute of limitation applicable to actions for malpractice. A demurrer to the plaintiff's complaint based on the ground that the action was barred by the statute was sustained in the lower courts and the judgment affirmed on appeal. The plaintiff contended that the cause of action did not accrue until the injury was discovered, some seven years after the commission of the wrongful act. The statutes of limitation of Ohio originally contained no provisions respecting knowledge of the cause of action, save in actions for fraud. In *Williams v. Pomeroy Coal Co.,* 37 Ohio St 583, the court had held in an action for trespass upon land that the applicable four-year statute of limitation governed regardless of when plaintiff

acquired knowledge of the trespass and, in particular, that, in this regard, there is no distinction between trespasses under ground and upon the surface.

Following that decision and, as the court said in *DeLong v. Campbell*, supra, unquestionably as the result of it, the legislature amended the section which fixed a four-year period of limitation for certain actions by providing that "[i]f the action be for trespassing under ground or injury to mines, * * * the causes thereof shall not accrue until the wrongdoer is discovered; * * *." The court commented that the general assembly had not seen fit to add a similar provision to the statute of limitation as to a malpractice action, although previously in two cases the Supreme Court of Ohio had held that the latest time at which a malpractice cause of action can accrue is the termination of the physician-patient relationship. This court has announced similar rulings.[①] The Ohio court continued:

> "If the proposition for which plaintiff contends was adopted as the law it would nullify many of the statutes of limitation. For instance, if the statute of limitations as to libel or slander did not begin to run until knowledge was had by the one injured by the libel or slander it might result that an action therefor could be brought an indefinite number of years after the libel or slander occurred. Such instances could be multiplied." 157 Ohio St at 28.

---

[①] Hotelling v. Walther, 169 Or 559, 130 P2d 944, 144 ALR 205; Shives v. Chamberlain, 168 Or 676, 126 P2d 28. In Dowell v. Mossberg, 226 Or 173, 179, 355 P2d 624, 359 P2d 541, we said: "It is equally well settled, and the plaintiff conceded, that the time begins to run with the termination of treatment rather than with the discovery of the malpractice unless fraud or concealment is involved." Citing Hotelling v. Walther, supra. On rehearing the opinion in this case was withdrawn, but not for any reason connected with the quoted statement.

See, also, *Lindquist v. Mullen,* 45 Wash 2d 675, 678, 277 P2d 724, an action for malpractice against a physician, where the court said:

"* * * We are satisfied that had the legislature intended the principle of *discovery* to apply to tort cases based on negligence, it would have specifically said so, as it did with regard to *discovery* in fraud cases."

This statement is referred to with approval in the recent case of *Roybal v. White,* 1963, 72 NM 285, 383 P2d 250. *Philpot v. Stacy* (1963, Ky) 371 SW2d 11, rejects the doctrine of discovery where the statute makes no exception in that regard. The subject is annotated in 80 ALR2d 368, 374, 387-400; 144 ALR 209; 74 ALR 1317.

We are told, however, that damage is the gist of the action of malpractice and that it cannot be determined from the allegations of the complaint when any damage was suffered by the plaintiff as the result of the defendant's negligence in closing the wound without first removing the surgical needle "lodged [as the complaint says] in plaintiff's abdomen." This theory appears to be introduced as a means of seeming to avoid the fault of judicial legislation, concerning which more will be said later; though, as it seems to us, it is only another way of saying that the cause of action does not accrue until discovery of the injury. For we doubt that it would be contended that if the plaintiff became aware of the presence of the needle in his body the day after the wrongful act he would not then have had a cause of action against the defendant for his want of care or skill, even though up to that time the plaintiff had experienced no pain or discomfort from that cause. It would seem that he,

at least, would have had the right to sue immediately to recover for the cost of an operation for removal of the needle and the pain and suffering incident to such an operation.

The case of *Bonomi v. Backhouse,* 120 Eng Rep 643, upon which reliance is placed, is beside the mark. The plaintiff in that case sued to recover damages for subsidence of his land caused by withdrawal of lateral support. The defendant owned land contiguous to that of the plaintiff containing underground mines. He worked the mines more than six years before the commencement of the action but no actual damage occurred until within the six years (the period of the applicable statute of limitations). The court held that the statute commenced to run, not from the time of the working of the mines, but from the time that actual damage occurred. The ground of the decision may best be seen by quoting from the opinion of Willes, J., for the Court of Exchequer:

> "There is no doubt that for an injury to a right an action lies: but the question is, What is the plaintiff's right? Is it that his land should remain in its natural state, unaffected by any act done in the neighbouring land, or is it that nothing should be done in the neighbouring land from which a jury would find that damage might possibly accrue? There is no doubt that in certain cases an action may be maintained although there is no actual damage. The rule laid down by Serjeant Williams, in note (2) to Mellor v. Spateman (1 Wms. Saund. 346 b.), is that, whenever an act injures another's right, and would be evidence in future in favour of the wrong-doer, an action may be maintained for an invasion of the right, without proof of any specific damage. This is a reasonable and sensible rule; but it has no application to the present case; for the act of the defendant

in getting the coal would be no evidence in his favour as to any future act: *getting the coal was an act done by him in his own soil by virtue of his dominion over it.* \* \* \*" (Italics added.) 120 Eng Rep at 656.

Similarly, Lord Cranworth in his opinion for the House of Lords, affirming the judgment below, said: "I think the error in the view which has sometimes been taken upon this subject, is this: It has been supposed that the right of the party whose land is interfered with, is a right to what is called the pillars or the support. In truth his right is a right to the ordinary enjoyment of his land, and till that ordinary enjoyment is interfered with, he has nothing of which to complain." 9 HCL 503, 11 Eng Rep 825, 829.

Were this language to be paraphrased so as to attempt to make it applicable to an action for malpractice, it might be said that the right of a person is to the ordinary enjoyment of his body and that right is interfered with when a surgeon leaves a needle or other foreign substance in his body and the owner of the body *eo instanti* has something of which to complain. The vital difference between the two cases is that it is not an unlawful act for a man to make an excavation on his own property, but it is an unlawful act for a surgeon to close the wound without first removing a surgical needle from his patient's body. The latter is an invasion of a personal right. See *Schmidt v. Merchants Despatch Transp. Co.,* 270 NY 287, 300, 200 NE 824, 104 ALR 450. The doctrine of *Bonomi v. Backhouse* is said to be regarded by many courts in this country as the settled rule, 15 Harvard Law Rev 574; see *Smith v. City of Seattle,* 18 Wash 484, 51 P 1057, 63 Am St Rep 910. The Pennsylvania

court rejected it as unsuited to the conditions of coal mining in this country, *Noonan v. Pardee*, 200 Pa St 474, 483, 50 A 255, 86 Am St Rep 722, 55 LRA 410. We need not concern ourselves with that controversy. We doubt that *Bonomi v. Backhouse* has ever before been cited as authority touching the operation of the statute of limitations in a malpractice action. This case is governed by the principle stated in *Bonomi v. Backhouse*, but there held inapplicable, that "for an injury to a right an action lies." This is the principle applied in malpractice actions as indicated by the authorities cited with approval by this court in *Piukkula v. Pillsbury Flouring Co.*, supra. To these may be added *Tessier v. United States*, 269 F2d 305 (1st Cir. 1959); *Murray v. Allen*, 103 Vt 373, 154 A 678 (failure to remove gauze sponge after operation); *Coady v. Reins*, 1 Mont 424 (reduction of fracture); *Giambozi v. Peters*, 127 Conn 380, 384-385, 16 A2d 833 (transfusion of infected blood); *Lotten v. O'Brien*, 146 Wis 258, 131 NW 361 (reduction of fracture); *Conklin v. Draper*, 241 NYS 529 (failure to remove forceps from body); *Bernath v. LeFever*, 325 Pa St 43 (operation on eye); *Graham v. Updegraph*, 144 Kan 45, 58 P2d 475 (radium treatment for cancer; failure to remove radium beads); *Becker v. Porter*, 119 Kan 626, 240 P 584 (broken portion of dentist's drill left in tooth); *Silvertooth v. Shallenberger*, 49 Ga App 133, 174 SE 365 (failure to remove needle); *Weinstein v. Blanchard*, 109 NJL 332 (failure to remove drainage tube); *Albert v. Sherman*, 167 Tenn 133, 67 SW2d 140 (root of extracted tooth left in patient's mouth). The same rule governs in actions against attorneys for their negligence, *Wilcox v. Plummer*, 4 Pet. 172, 7 L Ed 821; *Moore v. Juvenal*, 92 Pa St 484, 490. See, generally, 54 CJS 122, Limitations of Actions § 168;

idem 142, § 174 b; 34 Am Jur 126, Limitation of Actions, § 160; idem 128, § 161.

*Tessier v. United States,* supra, was an action under the federal tort claims act to recover for the negligence of a government physician and surgeon. The charge was that the government negligently permitted metal, namely, fragments of a needle, to remain in the plaintiff after an appendectomy. The government claimed that the action was barred by the statute of limitations. The court, in an opinion by former Chief Judge Magruder, now retired, held that the statute commenced to run from the time of the wrongful act. The court said: "Appellant's injury— the introduction and abandonment of the needle fragments—certainly occurred (if his allegations are accepted) on June 7, 1947 [the date of the operation]; it is irrelevant that the resulting harm became great only subsequently. * * * The tort alleged by appellant Tessier took place in Maine. It seems clear that the law of that state gave him a right of action as soon as the metal fragments were abandoned in him. There was a legal wrong on June 7, 1947, and suit thereon was not suspended because of any duty imposed on the United States to remove the fragments." 269 F2d at 309.

The opinion in *Wilder v. Haworth,* supra, recognized that hardships in particular instances might result from the application of the statute as written to this class of cases, but properly refrained from amending the statute under the guise of construction. A few other courts have not been so restrained and their well intended decisions have met with well merited criticism. Thus in Wood on Limitations, an authority

frequently cited by this as well as other courts of the country, it is said:

"The cause of action, except where the statute otherwise provides, in cases of fraud, arises from the time of its commission; and when courts of law hold to the contrary, it is by force of a judicial exception engrafted upon the statute, by the assumption of legislative and equitable powers, and is not warranted by any principle or rule of law, nor can it be supported by any known rule for the construction of statutes." 2 Wood on Limitations (4th ed) 1362, § 274.

From the earliest days of our judicial history to the present, eminent jurists have spoken against the evil of judicial legislation. We quote from Endlich, Interpretation of Statutes, § 5:

"What is called the 'policy' of the government, with reference to any particular legislation, is said to be too unstable a foundation for the construction of a statute. The clear language of a statute can be neither restrained nor extended by any consideration of supposed wisdom or policy. So long as a legislative enactment violates no constitutional provision or principle, it must be deemed its own sufficient and conclusive evidence of the justice, propriety and policy of its passage. The language of Mr. Justice Story, concerning constitutional construction, applies almost equally to that of statutes: 'Arguments drawn from impolicy or inconvenience ought here to be of no weight. The only sound principle is to declare *ita lex scripta est,* to follow and to obey. Nor, if a principle so just [and conclusive] could be overlooked, could there well be found a more unsafe guide [in] practice than mere policy and convenience. Men on such subjects complexionally differ from each other. The same men differ from themselves at different times. . . . the policy of one age may ill suit the wishes

or the policy of another.'" (Citing 1 Story on the Constitution (5th ed) 326, § 426.)

In August of 1963 Mr. Justice John M. Harlan of the Supreme Court of the United States delivered an address in Chicago entitled "Thoughts at a Dedication: Keeping the Judicial Function in Balance." While he was speaking with particular reference to the federal-state relationship, his observations upon the subject of judicial legislation have general application. We quote from his address as published in the American Bar Association Journal for October 1963, page 943, at 944:

"Apart from what they regard as the shortcomings of the federal system, some well-meaning people apparently believe that the judicial rather than the political process is more likely to breed better solutions of pressing or thorny problems. This is a compliment to the judiciary but untrue to democratic principle. That point of view is sometimes difficult for judges to resist for it carries ostensibly authentic judicial hallmarks—the function of statutory construction and the power of judicial review. If the Congress or a state legislature has passed an inadequate statute, why should it not be revised by judicial construction? If the statute is one that is manifestly unwise, harsh or out-of-date, why should it not be abrogated by the exercise of the power of judicial review? It is said that there can be nothing wrong with the courts so acting because whatever they may do can always be undone by legislative enactment or constitutional amendment.

"The objections to such alluring but deceptive plausibilities are more deepseated than might appear at first blush. For in the end what would eventuate would be a substantial transfer of legislative power to the courts. A function more ill-suited to judges can hardly be imagined, situated

as they are, and should be, aloof from the political arena and beholden to no one for their conscientious conduct. Such a course would also denigrate the legislative process, since it would tend to relieve legislators from having to account to the electorate. The outcome would inevitably be a lessening, on the one hand, of judicial independence and, on the other, of legislative responsibility, thus polluting the blood stream of our system of government. We should be on guard against any such deliberate or unwitting folly."

Upon this subject a distinguished state judge has written:

"* * * We consider it our duty to give the statute a fair and reasonable meaning and not, by a process of indirect attenuation, repeal or partially repeal it. The legislature, unlike the court, could hear testimony pro and con and could, as a matter of policy, determine whether the statute should be repealed, qualified, or remain as it is. We have no such freedom in determining the law. * * *" Schwartz, J., in *Pink v. Dempsey,* 350 Ill App 405, 416, 113 NE2d 334.

We quote from the opinion of Mr. Justice HAY in *Wilder v. Haworth,* supra;

"Counsel for plaintiff, on oral argument before this court, urged that we should ignore precedent and determine the question presented by the appeal upon broad considerations of justice. But the constitutional authority of a court of law is limited to the interpretation and enforcement of the law as it is written. Moreover, broad considerations of justice require that there should be statutes of repose to prevent the presentation of stale claims and discourage the assertion of fraudulent ones. 'The statute of limitations is a statute of repose, designed to protect the citizens from stale and vexatious claims, and to make an end to the

possibility of litigation after the lapse of a reasonable time.' *Guaranty Trust Co. v. United States,* 304 U.S. 126, 82 L. ed. 1224, 58 S. Ct. 785. Such protection is especially necessary in cases of the present sort. The physician and surgeon often are handicapped in their defense, because of the mute appeal that is made to the sympathies of jurors by the pitiable condition of plaintiffs in many malpractice cases. For obvious reasons, they should not be further handicapped by having to combat stale claims." 187 Or at 695-696.

The statute of limitations applicable to this case has no different meaning than it had in 1935 when *Piukkula v. Pillsbury Flouring Co.,* supra, was decided, or in 1950 when *Wilder v. Haworth* was decided. The legislature, in the meantime, has not chosen to amend the statute. And while the legislature, like Humpty Dumpty, can make a word mean just what it chooses it to mean,[2] the court cannot, with propriety, make legislative words mean what it chooses.

Our statutes of limitations are not court-made law, but mandates of the legislature acting within its acknowledged competency. The court has no commission to amend, correct, or repeal any of these statutes. Were we to yield to the plaintiff's insistence, this is precisely what we would be doing.

As pointed out in Louisell and Williams, Trial of Medical Malpractice Cases, § 13.07,[3] a few states have provided that any tort action may be brought at any time within the statutory period following the plain-

---

[2] "When *I* use a word," Humpty Dumpty said, in rather a scornful tone, "it means just what I choose it to mean—neither more nor less." Lewis Carroll, Through the Looking Glass (Modern Library, p 214).

[3] The statutes of limitations of all the states applicable to actions for malpractice are set forth in this work, §§ 13.14 to 13.64.

tiff's discovery of the wrongful act or the time when, by the exercise of reasonable diligence, he should have discovered it; and two states, Alabama and Connecticut, have statutes specifically pertaining to malpractice which may permit the period to commence at discovery, but both set a maximum period calculated from the date of the negligent act or omission. A measure similar to the two last mentioned (House Bill 1576)[4] was introduced at the 1963 Regular Session of the Oregon Legislative Assembly and passed the house, but died in the judiciary committee of the senate. See Senate and House Journal, 1963, p 758. Those who think that the policy of our statute of limitations as it affects malpractice actions, or any others, is unwise and unjust do well to seek a remedy at the hands of the legislature. The legislature enacted the statute and should be held responsible for the consequences, good or ill, which may flow from it. This court is not a policy making body and is not authorized to change a statute because it does not comport with the court's notion of justice. This view of the proper function of a court was expressed by Judge Magruder in *Tessier v. United States,* supra, 269 F2d at 310:

"It is argued on one hand that the statute of limitations expresses a policy of repose and should

---

[4]

"A BILL FOR AN ACT

"Relating to the statute of limitations upon actions for damages for personal injuries arising out of malpractice.

"*Be It Enacted by the People of the State of Oregon:*

"Section 1. An action to recover damages for injury to the person caused by malpractice of a physician, dentist, podiatrist or operator of a hospital or sanitarium shall be commenced within two years from the date when the injury is first discovered or in the exercise of reasonable care should have been discovered; provided that such action shall be commenced within four years from the date of the act or omission upon which the action is based."

be interpreted accordingly. Undeniably the legislature intends to strike down all stale claims, meritorious as well as frivolous. On the other hand, it is said that a person has in effect no remedy if his claim is barred before he knows that he has been wronged, and that such a person cannot be accused of sleeping on his rights. This court can not resolve this policy conflict. In the present state of the law we cannot possibly say, contrary to the plain mandate of 28 U.S.C. § 2401(b), that Congress intended that the statute be suspended until the plaintiff knows of the wrong; and we cannot remold the statute in the image of the equitable doctrine of laches. Soriano v. United States, supra, 352 U.S. 270, 77 S.Ct. 269."

In the recent case of *Schwartz v. Heyden Chem. Corp.*, 12 NY2d 212, 188 NE2d 142 (1963), the plaintiff charged that a product manufactured by the defendant and inserted in the plaintiff's sinuses for the purpose of making them perceptible in X-rays produced a carcinoma requiring the removal of an eye. The action was brought 15 years after the alleged negligent act was committed. In holding that the action was barred by the statute of limitations, the court (two judges dissenting) applied the rule of its decisions in malpractice actions rejecting the discovery doctrine. Answering the argument that the rule "is unjust," the court said:

"We should put aside the contention, often justifying abandonment of prior holdings, that social change or advancement in the sciences has so altered the subject matter upon which the law operates that a different result is called for. The insidious and 'inherently unknowable' nature of cancer and similar diseases was common knowledge in 1936 when *Schmidt* was decided. The affecting plea of a plaintiff who could not know he was being destroyed from within fell then upon

ears no less sensitive to such appeals than those now hearing this case. To our minds, the adoption of and adherence to the accrual rule by the Judges of our court from 1930 onward renders the simple assertion 'it is unjust' inadequate.

"Considering the function of a Statute of Limitations as a device for repose, a potential defendant's equities are the same whether the plaintiff knows of his condition or not. Repose is as beneficial to society in the one case as in the other. While the plaintiff's equities are greater in one case, it was presumably pursuant to a determination that the interests of an occasional claimant were subordinate to society's interest in repose that resulted in the Statute of Limitations in the first place. The existence of a discovery provision in the fraud statute bespeaks a legislative judgment that only in fraud cases, by their very nature, were there a sufficient number of unknown wrongs to justify a departure from the general rule. Apparently the rarity of such unfortunate cases in other types of actions did not outweigh the disadvantages of imposing a possible exception to the grant of repose to every person and industry who could be a potential defendant. It is hard to say for certain, but perhaps the possibility of feigned cases against unprepared defendants and the difficulties of proof in meritorious cases led to a decision that society is best served by complete repose after a certain number of years even at the sacrifice of a few unfortunate cases. Whatever the policy considerations, the recent amendment of the malpractice statute from two to three years (CPLR, § 214, subd. 6) makes it clear that the legislative choice was deliberately made in the face of strenuously advocated alternatives. (See 1942 Report of N. Y. Law Rev. Comm., pp. 141-143, recommending a discovery provision with an outside limit of six years. A similar recommendation was made in 1962. See N. Y. Legis. Doc., 1962, No. 65 [C].)

> "It is not without reason that change in this area has been thought by us to be the responsibility of the Legislature. Our court has no facilities to inquire into the incidence of hardship cases under the statute, nor the peculiarly legislative prerogative to balance the result of such an inquiry against the countervailing considerations of prudence and social tranquillity that are supposed to justify Statutes of Limitations. Moreover, how could we set limits to the right plaintiff would have us grant? Is it for a court to say that there shall be an outside limit of six years? If so, what of the fact that 15 years passed before plaintiff brought this action?" 12 NY2d at 218-219.

As Chief Justice Marshall said in response to a claim of injustice consequent upon the enforcement of a statute of limitations:

> "If this difficulty be produced by the legislative power, the same power might provide a remedy; but courts cannot, on that account, insert in the statute of limitations an exception which the statute does not contain." *M'Iver v. Ragan,* 2 Wheat. 25, 4 L Ed 175, 177.

The circuit court was right in sustaining the demurrer to the complaint and the judgment is affirmed.

SLOAN, J., dissenting.

In these cases involving the surgeon who conceals his negligence within a sutured surgical wound the courts have limited their consideration of the statute of limitations to a theory of discovery. Although I believe that lack of discovery provides an adequate reason to judicially withhold the start of the limitation period, it appears to me that in thus limiting the area of consideration the courts have overlooked long established fundamentals of liability for unintentional

torts that are otherwise generally applied. The sole
purpose of this opinion is to demonstrate that the
question presented by this case should be decided as
a question of fact—not of law. It should be granted
that in this case the court may be justified in holding
that the tort was complete and the cause of action
accrued when the needle was left in plaintiff's abdo-
men. But in the next case that issue may not be so
readily apparent. We should not tie our hands with
a doctrine that will be unworkable in many cases of
the undisclosed tort. The majority, by concentration
on the questionable rule of *expressio unius est ex-
clusio alterius* and on a laudable reluctance to legis-
late, overlook the less obvious but more fundamental
issue of the case. I urge that it is a mistake to decide
this case on demurrer. And the solution I propose
will eliminate the issue of judicial legislation.[①] And,
more importantly, it will provide a less arbitrary basis
for decision in cases of the unrevealed tort.

It is necessary to begin with the hornbook rule
that:

> "* * *   In a case of personal injury, caused by
> common law negligence, such as is alleged here,
> an actor is liable only if he invades an interest
> which the law protects against unintended invasion.
> 65 CJS 319, Negligence, § 1, c; Restatement, Torts,
> § 281; 38 Am Jur, Negligence, 672, § 27. Damage is
> the gravamen of such an action for negligence.
> Negligent contact with the person of another, caus-
> ing no physical damage is not actionable. That is
> to say, no right of the plaintiff is invaded in such

---

[①] For an exceptional appraisal of the lack of reality in relying
on legislative silence to create rules of law see Peck, The Role
of the Courts and Legislatures in the Reform of Tort Laws, 1963,
48 Minn L Rev 265.

a case unless actual damage is done." *Hall v. Cornett et al,* 1952, 193 Or 634, 643, 240 P2d 231, 235.

1 Harper & James, Torts, 1956, § 1.4, page 11; Prosser, Torts (2d ed 1955) page 165. Professor Prosser notes that the usually applied rule that the period of limitation does not begin to run in negligence action until damage has occurred has caused difficulty in the malpractice cases. He does no more than make the observation and cite cases.

In the instant case the complaint alleged that defendant left a surgical needle in plaintiff's abdomen. It then alleged: "Thereafter plaintiff experienced pain and bloating in the upper right quadrant of his abdomen * * *." We are not informed as to when plaintiff actually suffered damage. It can be argued, of course, that the presence of a surgical needle in one's anatomy would, ipso facto, cause harm. And, in the instant case, such well may be the fact. But common knowledge teaches that even metallic substance inserted into the anatomy in a given way or by a given means may never cause harm. Obviously, more pliable or dissolvable substances are less likely to inflict harm. Medical knowledge also discloses that certain materials, like needles that could be thought to be presumptively harmful, can remain in the anatomy for long periods without harm. And that other substances, like sutures, presumptively non-harmful, may ultimately cause harm. See for example, 2 Cyclopedia of Medicine & Surgery, 1962, page 249, et seq. Evidence, to this effect could be expanded. It is sufficient for present purposes to say that there is no justification to rule, as a matter of law, that harm is the inevitable result of every intrusion into any part of the anatomy of every kind of foreign sub-

stance. Yet this assumption has been the underlying unmentioned premise of all the cases like the instant one. If this premise is wrong, as I think it could be conclusively demonstrated, then a cause of action cannot be said to exist at all unless actual harm can be proven.

It is important to look at some of the similar areas of tort liability to see how the courts have decided when a cause of action accrues. The cases involving the negligent removal of lateral support present a like problem. The similarity of principle in the support cases can be found in the leading, and generally followed, case of *Bonomi v. Backhouse,* 1859, 120 Eng Reprint 652, reported in Bigelow, Cases on Rights in Land, 1945, page 120. In *Bonomi* the defendant had mined for coal on his own land. In doing so he damaged the lateral support to plaintiff's adjoining land. No damage occurred, and plaintiff did not know of the loss of lateral support until after the six year statute of limitations had expired. The entire reasoning of the court cannot be quoted. It can be summarized in this language:

"* * * We are not insensible to the consideration that the holding damage to be essential to the cause of action may extend the time during which persons working minerals and making excavations may be made responsible; but we think that the right which a man has is to enjoy his own land in the state and condition in which nature has placed it, and also to use it in such manner as he thinks fit, subject always to this: that, if his mode of using it does damage to his neighbour, he must make compensation. Applying these two principles to the present case, we think that no cause of action accrued for the mere excavation by the defendant in his own land, so long as it

caused no damage to the plaintiff; and that the cause of action did accrue when the actual damage first occurred." Bigelow, Cases on Rights in Land, page 123.

The language just quoted was followed by this paragraph:

"We should be unwilling to rest our judgment upon mere grounds of policy; but we cannot but observe that a rule of law, or rather the construction of a Statute of Limitation, which would deprive a man of redress after the expiration of six years, when the act causing the damage was unknown to him, and when in very many instances he would be in inevitable ignorance of it, would be harsh, and contrary to ordinary principles of law." Bigelow, Cases on Rights in Land, page 123.

The last paragraph is particularly interesting. The court recognized, as in the cases like we now consider, the policy problem of barring action on a negligent act before the act has been discovered, but did not rely thereon as a basis of decision. The English courts appear to have applied this rule to other negligent conduct: "* * * In other actions on the case, such as nuisance, negligence, etc., where the cause of action is not complete until damage has been suffered, the cause of action commences when the damage arises." (Citing *Backhouse v. Bonomi*). Pollock, Torts (15th ed 1951) page 155.

There are other cases in regard to the actual or probable invasion of land that are not inapt to the case at hand. These are the cases in which a landowner erects a structure upon his property, such as a dam, or otherwise alters his property by excavation or the like in such a way that later damage may be anticipated to the land of another. See McCormick,

Damages for Anticipated Injury to Land, 1924, 37 Harv L Rev 574. Professor McCormick's analysis of the cases reveals not only the wide diversity of the factual situations the courts have considered but also the conflicts in the courts' rulings. There are cases in which the damage is immediate, or in which it may be delayed but is certain to occur and others in which damage may be forseen to be continuous or perhaps only on occasion and maybe never. A variety of result can be found but generally it has been said that in cases of trespass involving direct damage, the cause accrues when the act is performed; and, that in cases in the nature of nuisance that actual damage must be shown before a cause exists. *McCormick,* supra, page 580, et seq; Prosser, Torts, supra, page 57; *Heckaman v. Northern Pac. Ry. Co.,* 1933, 93 Mont 363, 20 P2d 258. However, some of the cases hold that if damage is immediately forseeable the cause accrues when the condition has been created. The latter cases again divide on whether a plaintiff is limited to one action, within the limitations period, for all forseeable injury or may be entitled to a series of actions each time additional harm is caused. Most of the authorities cited recognize that either alternative is not satisfactory. Note, 1937, 21 Minn L Rev 334; Developments in the Law—Statutes of Limitations, 1950, 63 Harv L Rev 1177, 1200 et seq.

In Oregon we have adopted a rather anomalous rule in respect to the problem just mentioned. If an action for a nuisance may have accrued more than two years prior to the filing of the action we do not concern ourselves with the distinction between one action or several or as to the measure of damages, as found in many of the authorities cited. The plaintiff is allowed to recover for damages occurring within

two years preceding the filing of his complaint. If the action is deemed to be a trespass damages are allowed for the six years preceding the filing of the complaint. When the cause has accrued appears to have been immaterial. This court has not said that the cause accrued more than two years ago and is, therefore, barred. Instead the limitations period has been applied to limit the time for which damages may be claimed. *Norwood v. Eastern Oregon Land Co.*, 1932, 139 Or 25, 37, 5 P2d 1057, 7 P2d 996; *Martin et ux v. Reynolds Metals Company*, 1960, 221 Or 86, 342 P2d 790, cert den 362 US 918.

Although the cited authority in respect to the nuisance and trespass cases cannot be said to be more than analogous it does establish two things beyond dispute:

1. The word "accrue" does not have a fixed, invariable legislative meaning beyond the power of a court to define.

2. In actions on the case it is held that the action does not accrue until actual damage has occurred and is ascertainable.

Another group of analogous cases are those in the nature of products liability cases. In some of these it is held that the action does not accrue until damage occurs. *White v. Schnoebelen*, 1941, 91 NH 273, 18 A2d 185. In others, like *Dincher v. Marlin Firearms Co.*, (2d Cir 1952) 198 F2d 821, it was held that the action accrued when the negligent act was performed. In the latter case it was held that the action accrued when a defective gun was sold not at a later time when its negligent construction caused it to backfire causing harm to the plaintiff. Most of the cases say

the action accrues when the negligent conduct results in harm. See cases collated and discussed in 2 Frumer & Friedman, Products Liability, 1961, Chapter 12. In some of the products liability cases time has been treated as a causation question not as a matter of limitation. *Strandholm v. Gen. Const. Co.*, 1963, 235 Or 145, 382 P2d 843.

It is recognized that many of these cases are readily distinguishable from the case at hand. Others are not. The more decisive consideration is that the so-called theory of "discovery" of the cause of action has not been applied. Some of the cases attempt to distinguish between actions involving the matter of discovery. *Foley v. Pittsburgh-Des Moines Co.*, 1949, 363 Pa 1, 68 A2d 517. The attempted distinctions are not always justified. But these cases have not compelled a plaintiff to inspect and to know of the negligent installation of water tanks, construction of buildings, gas lines and the like immediately upon the performance of the negligent act as has been the situation in the malpractice cases. The courts have correctly applied the doctrine that damage must first occur.

In conclusion, our own cases of *Hotelling v. Walther*, 1942, 169 Or 559, 130 P2d 944, 144 ALR 205, and *Shives v. Chamberlain*, 1942, 168 Or 676, 126 P2d 28, establish that this court has not heretofore adhered to the rigid rule that a cause must and can only accrue when the negligent act has been done.

This case should be reversed and remanded to enable the question here presented to be decided as a question of fact as to when plaintiff actually suffered damage.

ROSSMAN, J., dissenting.

I join in the dissenting opinion of Mr. Justice SLOAN, and assume the privilege of amplifying the reasons set forth by him. With nothing but respect for the majority, I believe that its ruling is unjust and unfortunate.

I am convinced that the majority places an erroneous meaning upon the word "accrued" where it appears in ORS 12.010 (of our statute of limitation). That matter will receive further attention shortly.

Now that the majority opinion has become the law, the discovery rule which the courts of other states are embracing in increasing numbers is beyond judicial reach in Oregon. For this court to banish that rule, as it does today, and hold that it can be employed only in fraud cases—unless the legislature adopts special legislation such as the 1919 amendment—is a great misfortune. Henceforth, the discovery rule cannot be employed in a case such as, for example, one involving damage by seepage water unless the legislature determines whether the limitation period shall begin to run (1) when the first water enters the premises, (2) when the owner discovers the entry, (3) when the defendant commits the wrong that makes the entry possible, (4) when the plaintiff suffers damage, or (5) when some other incident occurs which the legislature accepts as crucial. Having considered all possibilities, it will be incumbent upon the legislature to do as it did in 1919—enact a measure. But, of course, by the time the measure is adopted, the limitation period has run and the plaintiff has lost his cause of action. In cases involving pollution of the air or water or the removal of lateral support from land similar problems would present themselves. Claims against

contractors who did their work negligently (*Strand-holm v. General Construction Co.,* 235 Or 145, 382 P2d 843) or others who installed defective mechanical equipment (*American Reciprocal Insurers v. Bessonette,* 235 Or 507, 385 P2d 759) will be denied relief under today's ruling unless the legislature gives attention to such cases. A person may own a tract of land underlaid with coal or oil and later discover that years ago a neighbor secretly mined the coal or pumped out the oil and that the statute of limitation ran before he had any intimation whatever of what was going on under the surface. The discovery rule, which many courts employ, prevents acts of injustice of the kind just mentioned; but this court today rejects the rule. The wrongful conduct occurs when the victim, like the anesthetized patient in the surgery, has no inkling whatever of what is going on.

Long ago, without the aid of any legislation, *Lewey v. Frick Coke Co.,* 166 Pa St 536, 31 A 261, employed the discovery rule so as to bring to account an individual who, working under the protection of the surface soil, mined his neighbor's coal. The court held that the discovery rule prevented the beginning of the limitation period until the victim received some inkling of what his burrowing neighbor was doing. Surely, a rule of that kind is just and falls within the ambit of the meaning of the word "accrue." And since a property owner has the protection of the discovery rule against the clandestine burrowing of his neighbor, who can explain why an individual who is anesthetized should be charged with knowledge that his surgeon failed to remove an object which he had placed in the incision. In fact, who can explain why a person should be charged with knowledge of anything that is unknown and unknowable?

Possibly it will be said that a general act can be drawn applicable to all types of cases and that it will not be necessary to enact special amendments to provide for individual cases such as seduction, malpractice, alienation of affections, installation of defective equipment, and so on. Very likely, a general act can be enacted if its draftsman is willing to run the risk of doing injustice in numerous of the cases to which his act is applicable. Throughout the centuries the courts have held that the accrual of an action is a judicial and not a legislative problem. We should stay with that point of view. We should not discard the discovery rule.

Although the maxim "Expressio Unius est exclusio alterius" is not of legislative origin, and according to Sutherland Statutory Construction (3rd ed), § 4917, "requires great caution in its application, and in all cases is applicable only under certain conditions," the majority render to it fealty that is akin to a navigator's respect for the pole star. Every legislative enactment should be viewed as a means of accomplishing justice and, in the absence of insurmountable obstacles, should never be given a construction which will defeat justice. The majority's interpretation of ORS 12.010 thwarts justice.

The majority employs ORS 12.010 in a manner that defeats the claim of a victim of malpractice while he remains blamelessly ignorant that (1) a surgeon left a foreign object in his abdomen and (2) he has a just claim against the suregon. It may be that in the two year period (statute of limitation) the patient continues to have full confidence in the surgeon and believes that the pains in his abdomen are natural aftereffects of the surgical operation. Yet, under the majority's ruling, the patient's rights end at the close of

the two year period. *Ayers v. Morgan,* 397 Pa. 282, 154 A2d 788 (1959) does not subscribe to the majority's views; it says:

> "* * * it would be illogical and unintelligent to say that a person who does not know, and cannot know, for example, that a surgeon has negligently left a rubber tube in his body, would be denied damages because his claim for damages was filed, due to delay in learning of the presence of the tube, more than two years after the operation."

Cicero declared, "Nothing that lacks justice can be morally right." I am satisfied that it is not morally right to hold that this plaintiff, whose cause of action is not contested, lost it at the end of two years (period of limitation) at a time when neither he, the defendant, nor anyone else on the face of the globe knew that the defendant had left a foreign object in the incision. To hold to that effect may produce a certain symmetry in the pattern of the law similar to that of fitting together puzzle blocks, but it sacrifices justice. Our paramount duty is not to see to it that each rule of law fits in nicely with all others, but to do justice. The holding of the majority that (1) the plaintiff could have sued the defendant for malpractice the day following the closing of the incision, although no one knew at that time that the plaintiff's abdomen held a foreign object, and (2) since the plaintiff could have sued the defendant (according to the majority) the day following the operation, therefore, the limitation period began to run on that day, requires the courts to transform the victim of malpractice from one who is blamelessly ignorant of what happened to him in the surgery into one who has full knowledge and is culpably at fault.

The erroneous reasoning in which the majority

engages can be justly avoided in the same manner that many other courts have employed by holding that the limitation period does not begin to run until the former patient discovers or should have discovered that a foreign object was left in the incision when it was closed. The very recent decision of *Johnson v. Caldwell,* 371 Mich 368, 123 NW2d 785 (October 10, 1963), adopted that rule (discovery rule) in a unanimous opinion. Michigan had previously employed the rule that the limitation period begins to run when the surgeon completes his services. The Johnson opinion substituted the discovery rule for the completion of treatment rule. The Michigan court, in mentioning a case that was decided in 1949, observed, "The trend since that time has been toward what may, for identification purposes, be designated the 'discovery rule.'" As just noted, the court adopted unanimously the discovery rule.

Many other jurisdictions that employ the discovery rule have legislation similar to the Oregon statute which provides that in fraud and deceit actions the period of limitation shall begin upon discovery. For example, California, which makes frequent use of the discovery rule, has California Code of Civil Procedure, § 338.4, which reads:

> "An action for relief on the ground of fraud or mistake. The cause of action in such case not to be deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake."

Colorado Revised Statutes, § 87-1-6, provides as follows:

> "No person shall be permitted to maintain an action, whether such action sound in tort or implied contract, to recover damages from any per-

son licensed to practice medicine * * * [lists all medical professions then specifies types of actions, i.e., malpractice] unless such action be instituted within two years after such cause of action accrued."

Next, section 87-1-10 provides:

"Bills for relief on the ground of fraud, shall be filed within three years after the discovery by the aggrieved party, of the facts constituting such fraud, and not afterwards."

Missouri Revised Statutes, in § 516.140, states:

"* * * All actions against physicians, surgeons, dentists, roentgenologists, nurses, hospitals and sanitariums for damages for malpractice, error, or mistake shall be brought within two years from the date of the act of neglect complained of * * * ."

Section 516.120 provides:

"(5) An action for relief on the ground of fraud, the cause of action in such case to be deemed not to have accrued until the discovery by the aggrieved party, at any time within ten years, of the facts constituting the fraud."

All three states employ the discovery rule, as can be readily seen from glancing at the extensive annotation in 80 ALR2d 568. See also *Thatcher v. De Tar,* 351 Mo 603, 173 SW2d 760.

In its interpretation of the word "accrued," which is a part of ORS 12.010, the prevailing opinion paraphrases the word so as to make it read "from the day that the incision containing the foreign object was closed." Although the majority expresses sharp disapproval of judicial legislation, yet, if a holding that

the limitation period does not begin to run until the patient discovers or has reason to suspect that a foreign object was left in the incision constitutes judicial legislation, it is impossible to understand that judicial legislation does not equally occur when the majority rules that the word "accrued" means "from the day that the incision containing the foreign object was closed." A consultation of the numerous meanings that have been given to the word "accrued" as they appear in (1) 54 CJS, Limitation of Actions, § 174, (2) 1A Words and Phrases Judicially Defined, Permanent Edition 582, (3) Trial in Medical Malpractice Cases by Louisell and Williams, §§ 13.07 through 13.09, and (4) the extensive annotation in 80 ALR2d 360-415 shows that the word has no single or rigid meaning. The decisions of our own court indicate that the word has received from our pens no less than three meanings in cases of this kind. *Hotelling v. Walther,* 169 Or 559, 130 P2d 944, and *Shives v. Chamberlain,* 168 Or 676, 126 P2d 28, held that the statute of limitation does not begin to run in favor of a practitioner until he has closed his relationship with his patient. *Hutchinson v. Semler,* 227 Or 437, 361 P2d 803, which involved an alleged contraction of an industrial disease reviewed many decisions including *Urie v. Thompson,* 337 US 163, 93 L Ed 1282, 69 S Ct 1018, which held that the statute of limitation does not begin to run until the purported victim of the wrong knows or should know that he is incurring an industrial disease. The Urie decision pointed out that if Urie were held barred from prosecuting his action because the statute of limitation had run before he discovered or had reason to suspect that he was incurring a disease, then the legislation would have "afforded Urie only a delusive remedy." *Wilder v. Haworth,* 187 Or 688, 213

P2d 797, held that the statute of limitation begins
to run in favor of the physician the day when he com-
mitted the act of malpractice and that the patient's
blameless ignorance of the wrong is irrelevant. *Wilder
v. Haworth* made no mention of *Urie v. Thompson,*
supra. Failure to mention that outstanding opinion
weakens materially the authority of the Wilder de-
cision. The Urie decision has been cited with approval
by many courts. There have been no dissents. The
opinion of the majority in this case makes no mention
of *Urie v. Thompson.*

The majority believe that because the legislature
did not include in its 1919 amendment to ORS 12.110
a provision applicable to malpractice actions similar
to that which it adopted concerning fraud actions that
it thereby decreed that the discovery rule should not
be applied in malpractice actions. Obviously, making
deductions of that kind involves speculation as to the
legislature's purposes and intentions. The mere fact
that the legislature in 1919 enacted a measure concern-
ing fraud actions is no reason for inferring that it
was hostile to or friendly with negligence, malpractice,
trespass, or other forms of actions. The legislature,
in its 1919 session, may have given no thought what-
ever to malpractice actions. But, if the legislature's
attitude upon a selected subject such as malpractice
can be discerned from its omission to have enacted a
given measure—in this case to have included in the
1919 amendment the subject of malpractice—is it not
reasonable to infer that the omission to have amended
the statute of limitation following the announcement
of the Hotelling and Shives decisions was tantamount
to legislative concurrence in the holding of those two
cases? That is, if it is reasonable to infer from the
omission of malpractice from the 1919 amendment that

the legislature did not wish to aid that type of case, is it not equally logical to say it would have repudiated the Hotelling and Shives decisions by legislation if it thought they misconstrued ORS 12.110? The one conclusion seems to be as logical as the other. Clearly, the legislature did not repudiate the Hotelling and Shives decisions. And if one is tempted to read the law by drawing inferences from what the legislature did not do, can he not reason that the legislature acquiesced in the construction placed upon ORS 12.110 by *Hutchinson v. Semler* which cited *Urie v. Thompson* in support of the rule that the period of limitation does not begin to run until discovery. More than a score of years and more than ten legislative sessions have passed since the announcement of the Hotelling and Shives decisions.

Experience teaches that the legislative mind cannot be read in the manner that the majority attempts. The majority is not warranted in trying to deduce from the 1919 omission to extend the discovery rule to other types of cases that the legislature intended to confine the rule to fraud and deceit cases only. The simple explanation for the 1919 amendment is that two decisions announced by this court in fraudulent land transaction cases shortly before the 1919 session obviously attracted the legislature's attention, and that body wished that in future cases involving fraudulent land transactions the courts should not repeat the holdings in those two cases. But no case concerning malpractice had been before the courts. Much time and intense familiarity with the law would have been required to have included in the 1919 amendment provisions detailing the commencement of the limitation period in cases such as alienation of affection, damage by seepage of water, withdrawal of latteral sup-

port, the mining of coal under the land of the miner's neighbor, pumping of oil from not only the driller's land but also that of others in the area, and injury from the placing of a delayed-action bomb. Those are but a few of the cases for which provision would have had to be made by the legislature if the majority is warranted in holding that the 1919 amendment confined the discovery rule to actions of fraud and deceit only. This case, involving only an action of malpractice was presented to this court six months ago and has not yet been decided. That fact indicates the difficulty which will perplex any legislator who endeavors to introduce through legislation the discovery rule in this state. Very likely, the difficulties of drafting a comprehensive measure applicable to the full range of cases persuaded the legislature to deal only with the pressing problem of fraud, and trust the good sense of the courts to deal with the other types of cases. After all, as is held in the recent decision of *Fernandi v. Strully*, 35 NJ 434, 173 A2d 277, "* * * 'the question when a cause of action accrues is a judicial one' * * *." The legislature clearly did not by any express language limit the discovery rule to fraud actions only, and no one has mentioned any reason why it would have wished to do so. The fact that in many of the other jurisdictions the discovery rule is successfully employed in the full range of all cases is persuasive evidence that no one in Oregon would have had any reason to limit the rule to fraud cases only.

When the prevailing opinion rules that the plaintiff was barred from seeking relief before he or anyone else knew that a foreign object remained in the incision, but that he could have sued the surgeon for damages the day following the closing of the incision,

it is impossible to understand how the plaintiff, lacking knowledge of what had occurred in the surgery and likewise lacking evidence of what had happened to him, could have instituted an action. The majority oversimplifies the problem of one who has undergone surgery which turns out to be unsuccessful. The "right" to sue upon the day following the operation—when the plaintiff did not know and could not know that a needle remained in his abdomen—obviously is delusionary. The period of limitation should not be started from such a false point.

A patient who undergoes an operation is taken into the surgery of a hospital and is given anesthesia which renders him unconscious. He knows nothing of what takes place in the surgery. All of his intimates, such as relatives, friends, and neighbors are excluded —and properly so—from the operating room. Accordingly, all knowledge of what takes place in the course of the operation, such as the placing of objects in and removing them from the incision is exclusively in the possession of the surgeon.

Mention has been made that in the period following the operation the patient may experience pain in the region of the incision but that he may infer that it is an after-effect of the operation which he must tolerate for a while. The surgeon may have warned the patient before the operation was begun that surgery possibly will not correct completely his condition of ill health; that warning may have a tendency to cause the patient to misinterpret the post-operative pains. To charge the patient with knowledge the day following the operation that an act of malpractice occurred and begin to count off against him the limitation period ignores the realities. But, let us assume that a suspicion steals into the patient's mind that possibly some irregularity

occurred in the surgery or that perchance something was left in the incision. What can he do about it?

If the former patient goes to a new physician and requests him to check up on the work of the first surgeon, he is confronted with the fact that every professional man is loath to review and criticize the work of another. If a practice of that kind were cultivated, friction in the medical profession would result. Mention is made of that fact not for the purpose of indicating that the courts should protect the medical profession from it, but because it indicates the difficulty that the former patient would encounter in endeavoring to ascertain what had happened to him in the surgery.

Although the majority indicates that the patient in whose abdomen a foreign object was left has a cause of action at once and may sue the next day, an action cannot be instituted unless the patient can establish that a foreign object is in his abdomen as a result of negligence. It is virtually a certainty that the patient has no knowledge on the day following the surgery—nor for a long time thereafter—that a foreign object was left in the incision.

It must be apparent that in many instances it is extremely difficult, in the absence of a resort to a second operation, for the former patient to establish that a foreign object remains in the incision. Many of our rules of evidence arose out of judicial ingenuity in dealing with the problems that arise when the plaintiff lacks access to the facts and the defendant has them under his control. For example, when a person enters an elevator or passenger car he has no means of knowing whether a defect exists in the mechanism. If a mishap occurs, the evidence is in the possession of the party whom he must sue. That situation and

others similar to it created the rule of res ipsa loquitur. The latter enables a person who is injured by an implement in the possession of the defendant to rest his case without offering evidence upon the subject of negligence. Likewise, if a bailor places objects in a warehouse and, upon receiving their return, finds that they are in a damaged condition, he need not offer in the first place evidence of negligence. Obviously, the evidence indicating the injury to the goods is in the defendant's not the plaintiff's, custody.

In the present case the problem that confronts the plaintiff is not that of establishing that the defendant left a needle in the plaintiff's abdomen. For present purposes the plaintiff's allegations that the defendant left a needle there is not disputed. Further, for present purposes, the defendant does not deny that he left the needle in the incision the day of the operation. But the plaintiff's problem is that of dealing with the defense based upon the statute of limitation. The defendant argues that the plaintiff should be charged as of the day of the operation with knowledge that a needle was left in the incision. The plaintiff answers that he should not be charged with knowledge of that kind until he actually was aware of it. Although the problem before us assumes a different form and employs different words from that which expresses the res ipsa loquitur rule, yet both situations are concerned with a party to litigation who has control of the facts and who proposes to use his advantage unfairly. In cases involving res ipsa loquitur blameless ignorance of the facts is excused and the party that has control over the evidence is prevented from making misuse of his advantage. He is not granted a nonsuit when the plaintiff cannot offer evidence of negligence. In cases involving the statute of limita-

tion a party may be held to have waived the defense or be estopped from pressing it.

Many courts hold, as we have seen, that the period of limitation does not run against the former patient and in favor of the surgeon until the former patient knows or should reasonably know that the surgeon permitted a foreign substance to remain in the incision when he closed it. Those courts, in so holding, do not employ the words that commonly occur in bailment cases or in others that involve the doctrine of res ipsa loquitur, but, based upon the fact that the surgeon has control of the facts do not require the patient to take a stand in regard to the statute of limitations until he knows that the surgeon left a foreign object in the incision or should reasonably have known of it. The rule thus employed is known as the discovery rule. Our court has long employed rules such as those that pertain to bailments and that constitute the doctrine of res ipsa loquitur.

The majority do not argue that the discovery rule is not sound. Nor do they contend that it will not produce justice in this case. They say that its employment in Oregon would constitute judicial legislation. The word "accrued," where it appears in ORS 12.010, is the crucial word. The legislature has not defined it. ORS 12.010 goes no further than to say that "actions at law shall only be commenced within \* \* \* after the cause of action shall have accrued \* \* \*." Since the legislature has not detailed the meaning of "accrued" and since the statute cannot operate unless a meaning is given to that word, the legislature obviously expected the courts to choose from among the many meanings, the one best suited to the purpose of ORS 12.010. Notice has been taken of the fact that

it is no more judicial legislation to say that "accrued" means "the day when the patient discovers or should discover the presence of the needle" than to say that it means "the day when the incision containing the needle is closed."

The majority, however, argue that when the 1919 session of our legislature amended our two-year provision so as to make it read "in an action at law based upon fraud or deceit, the limitation shall be deemed to commence only from the discovery of the fraud or deceit," it thereby decreed that the discovery rule should be employed only in fraud cases. I have mentioned that no one suggests any reason for limiting the discovery rule to fraud cases. Other jurisdictions which employ the discovery rule make no restriction of that kind. California, one of the first states that repudiated the rule which the majority favors and which has a statute similar to the one that the prevailing opinion believes shackles this case, has employed the discovery rule freely many times and has never intimated that its statute restricts the discovery rule to fraud cases.

We have taken note of the fact that the enactment of the 1919 amendment was preceded by the announcement of two decisions by this court in land fraud cases which obviously had caught the attention of the legislature. Plainly, the legislature wished to correct the rule which this court employed in those cases without undertaking to write a sweeping statute governing the entire range of actions to which the limitation periods are applicable. Very likely, it reasoned that since the determination of the accrual of an action is a judicial function rather than a legislative one, the courts would have no difficulty with the employment of the discovery rule in other types of cases after the legisla-

ture had enunciated it in fraud actions. If this court, rather than the legislature, had pronounced the discovery rule which was the subject of the 1919 amendment, no one would have inferred that we confined the rule exclusively to fraud cases.

But the majority lays great stress upon the maxim "Expressio unius est exclusio alterius." Concerning that maxim Mr. Justice KESTER, in *Moore v. Schermerhorn,* 210 Or 23, 307 P2d 483, 308 P2d 180, said:

> "The maxim 'expressio unius est exclusio alterius,' on which petitioner relies, and the somewhat related doctrine of ejusdem generis, are not rules of law, but merely guides in determining intent. They must be harmonized with other rules of construction * * *."

Continuing, *Moore v. Schermerhorn* declared:

> "In *State v. Standard Oil Co.,* 61 Or 438, 448, 123 P 40, in discussing the application to statutes of the maxim 'expressio unius est exclusio alterius,' the court said:
>
> " '* * * If there is some special reason for mentioning one, and none for mentioning a second, which is otherwise within the statute, the absence of any mention of the latter will not exclude it. 2 Lewis, Sutherland, Statutory Construction, § 495.' "

Using the reasoning just noted, it can readily be seen why the legislature, in enacting the 1919 amendment, mentioned fraud actions without referring to others. Fraud actions at that time commended the legislature's attention. Malpractice and other types did not. The legislature probably thought that if it gave the courts an inkling of what it had in mind, no further difficulty would be experienced.

We take the following from 82 CJS, Statutes, § 333, at page 668:

"The maxim, Expressio unius est exclusio alterius, that the mention of one thing in a statute implies the exclusion of another, is merely an auxiliary rule of statutory construction, to be applied with great caution; it is not a rule of substantive law, or a constitutional command. The maxim is not of universal application, or conclusive as to the meaning of a statute; and it does not constitute a formula for construction to be arbitrarily applied. The maxim should be applied only as a means of discovering the legislative intent, which is otherwise not manifest, and should never be permitted to defeat the plainly indicated purpose of the legislature. Also, the maxim is not a means of restricting the plenary power of the legislature in enacting legislation, or of controlling express constitutional provision.

"The maxim, Expressio unius est exclusio alterius, is applicable only where in the natural association of ideas the contrast between a specific subject matter which is expressed and one which is not mentioned leads to an inference that the latter was not intended to be included within the statute. Accordingly, the maxim is inapplicable if there is some special reason for mentioning one thing and none for mentioning another which is otherwise within the statute, so that the absence of any mention of such other will not exclude it.  *  *  *"

It will be observed that when the majority opinion becomes the law the discovery rule will be beyond judicial reach until the legislature, in instance after instance, adopts amendments similar to the 1919 measure. That will be a development much to be regretted.

It is reasonable to believe that the draftsman of the 1919 amendment, in preparing his measure concerning fraud actions, was not thinking in terms of

a comprehensive measure covering the full range of all kinds of actions—tort and contract. Very likely, if he had thought that the "expressio" of the rule about fraud cases would be construed by this court as the "exclusio" from the discovery rule of all other types of cases, he would have taken a very different course.

Decisions, of which *Fernandi v. Strully,* 35 NJ 434, 173 A2d 277, is an excellent recent illustration, hold that the limitation period does not begin to run until the victim of the malpractice knows what has happened or has good reason to suspect it. In reaching that conclusion it overruled a previous decision which had taken the view adopted today by the majority of this court. The following reasoning taken from the New Jersey decision is perculiarly applicable to the issue now under consideration in the case at bar.

> "Although New Jersey's Legislature has provided that every action at law for injury to the person shall be brought within two years after the cause of action shall have accrued, it has, as pointed out earlier in this opinion, never sought to define or specify when a cause of action shall be deemed to have accrued within the meaning of the statute, nor has it ever expressed itself as to the effect to be given under the statute (N.J.S. 2A:14-2, N.J. S.A.) to the fact that the injury was not known to or discoverable by the injured party within the period of two years. Cf. N.J.S.A. 34:15-34. The rather obscure nature of the legislature phraseology is amply attested by the frequency of the cases in which courts have been required to pass on when the cause of action may properly be said to have accrued and the many instances in which they have reached disparate results. See Church of Holy Com'n v. Paterson, etc., R.R. Co., 66 N.J.L. 218, 49 A 1030, 55 L.R.A. 81 (E. & A. 1901); Id., 68 N.J.L. 399, 53 A. 449, 1079 (E. & A. 1902); cf. Restatement Torts § 899, comment (e) (1939); 63

Harv. L.Rev. supra, at p. 1200; 9 W.Res. L.Rev. 86, 90 (1957); 49 Mich.L.Rev. 937, 950 (1951). In reaching their results they have exercised what has long been recognized as their proper judicial function; as expressed in Mr. Wood's well known treatise, 'the question when a cause of action accrues is a judicial one, and to determine it in any particular case is to establish a general rule of law for a class of cases, which rule must be founded on reason and justice.' 1 Wood on Limitations § 122a, 685, 686 (4th ed. 1916). See 63 Harv. L. Rev., supra, at p. 1200; cf. 9 W. Res. L. Rev., supra, at p. 97."

We also quote the following from the New Jersey decision:

"* * * to the extent that Weinstein v. Blanchard, supra, 109 N.J.L. 332, 162 A. 601, embodies a contrary view, it is hereby disapproved."

The Weinstein decision had stood for many years. It and similar decisions are giving way to the more enlightened discovery rule.

Some courts reason that until the surgeon removes from the body of his patient the materials or implements that he placed there, such as forceps, sponges, and needles, he has not completed the undertaking to which he engaged himself when he agreed to perform the operation. They therefore hold that the period of limitations does not begin to run until he removes from the incision the things that he placed there. If an owner employs a building contractor to do some construction work, he expects the contractor to remove from the premises all of his tools, equipment and the building debris. Until all has been removed, the work is not completed. Many courts employ that point of view when the facts disclose that the surgeon left a sponge, rubber hose or surgical needle in the incision.

*Ayers v. Morgan,* 397 Pa 282, 154 A2d 788, is a good recent decision of that kind. Although it is very recent, it has been many times cited with approval. In that case the surgeon left in the patient a metallic sponge. The Pennsylvania statute of limitation reads:

> "Every suit hereafter brought to recover damages for injury wrongfully done to the person, in case where the injury does not result in death, must be brought within two years from the time when the injury was done and not afterwards * * * ."

*United States v. Reid,* 251 F2d 691, was a suit under the federal tort claims act for the negligence of a physician in failing to advise a civilian army employee, who was entitled to treatment, that he had incipient tuberculosis. A radiologist discovered the incipient tuberculosis March 10, 1949, but the defendant failed to disclose it to the patient. The period of limitation had expired unless it began when the plaintiff became aware of the facts. The United States Court of Appeals, in affirming the District Court judgment, held that the claim did not accrue until advanced tubercular conditions became manifest.

*Quinton v. United States,* 304 F2d 234, adopted the reasoning of *Urie v. Thompson,* supra, and held that the action was not barred.

*Spath v. Morrow,* 174 Neb 38, 115 NW2d 581, ruled a suregon liable who had left in plaintiff's abdomen a suture needle and that the bar period did not begin to run until after the plaintiff had discovered the needle. The Nebraska decision cited approvingly the above mentioned Pennsylvania and New Jersey decisions. The Nebraska decision concluded with the following observations:

> "In Williams v. Elias, supra, this court took

note of the mutual confidence which is essential in the relation between physician and patient; that the physician should have a reasonable opportunity to correct the mistakes incident to even skilled surgery; and that the physician should not be harrassed by premature litigation instituted in order to save the rights of the patient. Patients should not be encouraged to go from physician to physician in an effort to ascertain whether the diagnosis made and the treatment received are proper. Silence on the part of the physician for the statutory period should not destroy the rights of the patient.

"We conclude that the cause of action in this case did not accrue until the plaintiff discovered, or in the exercise of reasonable diligence should have discovered, that a foreign object had been left in her body. The demurrers of the defendants should have been overruled. The judgment of the district court is reversed and the cause remanded for further proceedings."

It is unnecessary to give further attention to the precedents. Many others that reached the same result are reviewed in 80 ALR2d 320. However, the majority appears to be much impressed with the Ohio decisions. If one will study the treatise, "Cause of Action and the Statutes of Limitation—'The Chains that Bind,'" 9 Western Reserve Law Review 86, he will observe that the Ohio experience should be avoided in this state. The article just cited shows the many Ohio decisions that have been overruled and the legislation that has been nullified by strict construction. The article states:

"Thus the rule that the cause of action accrues upon discovery of the injury was given a strict construction by courts seeking to minimize the change in the common law. The succeeding generation of judges inherited the anti-legislation precedent of its forebearers. Faced with the choice of

breaking with precedent and giving the statutes a liberal construction, or following precedent, the courts chose the latter. The severe result of this choice frustrated both the unsuccessful litigant barred on a procedural technicality and the judge. The useful rule of discovery lies dormant, and the courts remain linked to harsh precedent by chains forged by their predecessors." .

The unjust results which emanate from the rule which the majority employs is illustrated in the following paragraph quoted from 12 Wyoming Law Journal 30:

"This unrealistic approach of the majority rule has resulted in 'shocking' consequences in many decisions. The Kansas court held a two year statute had run in an action where radium beads were negligently permitted to remain in the body of a patient, despite assurances to the contrary, ultimately resulting in her death six years later, at which time the beads were discovered. The dissenting judge disapproved of a rule permitting a doctor to set an agency such as radium in operation and escape liability because it takes more than two years for the radium to accomplish the inevitable end—the death of the patient. Another case involved a pair of forceps which were left in a patient and not discovered until thirty months later when one-half of the forceps was discharged from the plaintiff's bowels. The court held this action was barred under a one year statute since the cause accrues '. . . when a party has the right and capacity to sue, and his right of action is not suspended until he ascertains that he has a cause of action.' Impractical results such as these have occurred in many other cases and demonstrate only too well the unreasonable character of the majority rule."

We take the following from the same treatise:

"While some courts have stated that they have

no alternative other than to follow the legislative dictates in holding that the words 'after the cause of action accrues' refers specifically to the date of the wrongful act, other courts have construed the very same words to reach a more practical and reasonable result. It has been pointed out that the courts have both a duty and a right to make a judicial determination of the date of accrual where the legislature fails to state when it shall accrue. The necessity for a reasonable construction can probably be illustrated most clearly by using the words of the Colorado court in *Rosane v. Senger,* when it was stated: 'It is . . . an ancient maxim of the common law that "Where there is a right there is a remedy." What a mockery to say to one, grievously wronged, "Certainly you had a remedy, but while your debtor concealed from you the fact that you had a right, the law stripped you of your remedy." ' "

We should not sustain the demurrer to the complaint. It is inevitable that the point of view which sustains the demurrer will be swept aside by enlightened judicial determination or by legislative action. The following is also taken from 12 Wyoming Law Journal, page 37:

"It would appear from the modern trend, both through a judicial and a legislative viewpoint, that courts are beginning to realize that only the negligent physician is protected by the majority rule—at the expense of the public and of competent practitioners. In cases decided since 1940, only nine jurisdictions have consistently refused to toll the statutes or to permit a portion of the action and two of these decisions were with strong dissents. On the other hand, eighteen jurisdictions have either held that the statute was tolled, or have permitted a portion to remain on a contract theory. In addition, several statutory reforms have been instigated. The Missouri statute reads, in effect, that

the cause of action will not accrue at the date of the technical breach, but only when the resulting damage is ascertainble and sustained. A statutory amendment has been proposed in New York which would provide that the statute commences to run at the date of the discovery, if within six years. * * *"

The majority's rule has its roots in the past, and those roots are in a state of decay. When the demurrer is sustained the plaintiff is denied recovery, but before long the decay will have been completed and a future litigant will succeed where this one was turned away empty handed but subjected to costs.

I dissent.

O'CONNELL, J., joins in this dissent.