Florence J. IVERSON, Plaintiff
and Appellant,

v.

W. E. G. LANCASTER, M.D., and the Fargo
Clinic, Fargo, North Dakota, De-
fendants and Respondents.

Howard IVERSON, Plaintiff and Appellant,

v.

W. E. G. LANCASTER, M.D., and the Fargo
Clinic, Fargo, North Dakota, De-
fendants and Respondents.

Nos. 8469, 8470.

Supreme Court of North Dakota.

April 25, 1968.

Frederick E. Saefke, Jr., Bismarck, for appellants.

Wattam, Vogel, Vogel, Bright & Peterson, Fargo, for respondents.

ERICKSTAD, Judge.

This opinion covers two causes of action. The first was brought by Florence J. Iverson as plaintiff against W. E. G. Lancaster, M.D., and the Fargo Clinic as defendants. The second was brought by Florence's husband Howard as plaintiff against the same parties as defendants. The summonses were served on June 23, 1964, and the complaints on July 13, 1964.

The essence of both complaints is that Dr. Lancaster negligently failed to diag-

nose Mrs. Iverson's condition of hypertension, commonly known as high blood pressure, as due to coarctation of the aorta; that he advised her that because of her hypertension, she should not become pregnant; that he advised her that she should have a tuboligation so that she and her husband might be allowed to adopt children and that as a result she underwent a hysterectomy, which now prevents her from bearing children; and that subsequently he discovered that she had coarctation of the aorta and recommended corrective surgery, which resulted in the elimination of her hypertension.

Among other things, the defendants denied in their answers that either the doctor or the clinic was in any respect negligent, and in separate defenses they asserted that the complaints were barred by N.D.C.C. § 28–01–18 because the causes of action accrued more than two years before the commencement of the lawsuits.

The cases were consolidated for trial and came on for jury trial in the District Court of Cass County on January 17, 1966. When the plaintiffs rested their cases at the completion of the submission of their evidence, the defendants moved for a dismissal with prejudice of each of the causes of action and in the alternative for a directed verdict. The trial court granted the motion for dismissal. It is from the judgments entered on the orders dismissing the plaintiffs' complaints that the appeals are taken.

Before we consider the specifications of error on the part of the Iversons we are asked by the defendants (whom we shall hereafter refer to as Dr. Lancaster) to determine whether the causes of action have been outlawed by § 28–01–18:

28–01–18. Actions having two years limitations.—The following actions must be commenced within two years after the cause of action has accrued:

\*    \*    \*    \*    \*    \*

3. An action for the recovery of damages resulting from malpractice; \* \* \*

North Dakota Century Code.

By way of background it should be noted that after issue was joined but before trial Dr. Lancaster made a motion for summary judgment on the ground that the causes of action were outlawed by the statute of limitations. This motion was denied by the trial court without explanation.

The facts pertinent to this issue are that Dr. Lancaster first saw Mrs. Iverson in July 1957; that she continued to see him for the treatment of high blood pressure from then until June 27, 1962; that on February 27, 1959, a hysterectomy was performed on Mrs. Iverson by Dr. Darner, after Dr. Lancaster had advised a tuboligation; that after further examination Dr. Lancaster, on June 27, 1962, discovered that she had a coarctation of the aorta and advised corrective surgery; and that on July 5, 1962, surgery for coarctation of the aorta was performed upon her at Minnesota Heart Hospital, eliminating her high blood pressure.

Dr. Lancaster argues that because the actions were not commenced until June 1964, more than two years had elapsed after the causes of action had accrued, and thus they are outlawed by § 28–01–18. He contends that the causes of action accrued when the hysterectomy was performed on February 27, 1959. Among other citations he refers us to Milde v. Leigh, 75 N.D. 418, 28 N.W.2d 530, 173 A.L.R. 738 (1947); Linke v. Sorenson, 276 F.2d 151 (8th Cir. 1960); and what he describes as the "general rule," as contained in 63 Harv.L.Rev. 1177.

The part of the law review article cited as pertinent reads:

The statutory period may begin either when the defendant commits his wrong or when substantial harm matures. This choice, unnecessary where the two events are simultaneous, becomes complex where considerable time intervenes; here the courts have generally looked to the substantive elements of the cause of action on which the suit is based. If the de-

fendant's conduct in itself invades the plaintiff's rights, so that suit could be maintained regardless of damage—as with a breach of contract and most intentional torts—the statute commences upon completion of the conduct. But if harm is deemed the gist of the action, the occurrence of harm marks the beginning of the period.

Developments in the Law—Statutes of Limitations, 63 Harv.L.Rev. 1177, 1200–1201 (1950).

Notwithstanding what was said in *Milde* and *Linke* (both of which arose in North Dakota) and the alleged general rule, we are of the opinion that neither of the causes of action in these appeals has been outlawed by the statute of limitations for reasons we shall hereafter explain.

The annotator of 80 A.L.R.2d 368 makes the following analysis:

> There is, theoretically, a choice as to the event which starts limitations running against a malpractice action; the period may commence to run when a practitioner's wrongful act or omission occurred, or when such act or omission resulted in injury, or when the injury was, or by the exercise of reasonable diligence should have been, discovered, or, in the case of continuing treatment by the practitioner, when the treatment terminated.
>
>     \*    \*    \*    \*    \*    \*

Annot., 80 A.L.R.2d 368, 373 (1961).

■ After studying the various approaches taken by the courts, the recent trend of decisions to depart from the "general rule," the indefinite language of our statute, and our belief that justice is best served when claims are adjudicated on their merits, we conclude that the best rule is that the limitation period commences to run against a malpractice action from the time the act of malpractice with resulting injury is, or by reasonable diligence could be, discovered. Jurisdictions adopting this rule are listed in 80 A.L.R.2d, at 388, under § 7 [b]. For cases following the

discovery rule decided since the publication of that annotation see: Yoshizaki v. Hilo Hospital, Hawaii, 433 P.2d 220 (1967); Waldman v. Rohrbaugh, 241 Md. 137, 215 A.2d 825 (1966); Johnson v. St. Patrick's Hospital, Mont., 417 P.2d 469 (1966); Berry v. Branner, Ore., 421 P.2d 996 (1966).

In *Johnson,* speaking for the majority of the Montana Supreme Court, Justice John C. Harrison discussed the so-called general rule and the various exceptions to it and commented:

> All of these exceptions to the so-called "general rule" which respondents want this court to follow illustrate that in reality the "general rule" has little to recommend it.

He concluded the majority opinion as follows:

> We believe that our sister state of Idaho when confronted with the problem presented by the facts of this case has adopted the best reasoned rule, which we adopt and will follow. It is: "Where a foreign object is negligently left in a patient's body by a surgeon and the patient is in ignorance of the fact, and consequently of his right of action for malpractice, the cause of action does not accrue until the patient learns of, or in exercise of reasonable care and diligence should have learned of the presence of such foreign object in his body." Billings v. Sisters of Mercy of Idaho, 86 Idaho 485, 389 P.2d 224 (1964).

Johnson v. St. Patrick's Hospital, Mont., 417 P.2d 469, 473 (1966).

It is interesting, in light of Dr. Lancaster's contention that *Milde* and *Linke* constitute precedent requiring us to follow the so-called general rule, that one of the justices of the Montana Supreme Court dissented in *Johnson* on the ground that the adoption of the Idaho rule overruled by implication precedent in Montana.

In *Berry* the Oregon Supreme Court, in holding that the cause of action accrued at the time the plaintiff obtained knowl-

edge or reasonably should have obtained knowledge of the tort committed upon her person, overruled Vaughn v. Langmack, 236 Ore. 542, 390 P.2d 142 (1964), a decision rendered only two years earlier.

We note the Oregon court's analysis of the trend away from the "general rule":

> An examination of the cases decided subsequent to those discussed in *Vaughn* indicates that the trend is away from that decision. Those decisions discussed in *Vaughn* indicated that the states of California, Colorado, Michigan, Nebraska, New Jersey, and Pennsylvania, as well as certain federal cases held that the statute of limitations in malpractice cases commenced to run from discovery, or the time discovery could reasonably have been made. To those states might also be added the following: Florida, Louisiana, Maryland, and Oklahoma, as well as other federal cases. In addition the states of Idaho, Montana, and West Virginia, whose decisions previously supported *Vaughn* have now overruled their prior holdings. This leaves the states of Georgia, Indiana, Illinois, Kansas, Kentucky, Maine, Massachusetts, Mississippi, New Mexico, New York, Ohio, Tennessee, Virginia, Vermont, Washington, and Wisconsin, as apparently still following what has been termed the majority rule. When one looks at these cases, however, it is readily apparent that so-called "exceptions" have in many instances been developed to alleviate the hardship imposed by the majority rule. As a consequence some rather tenuous theories are espoused by many jurisdictions. * * * (footnotes omitted)

Berry v. Branner, Ore., 421 P.2d 996, 999–1000 (1966).

That court's view of the objective of statutes limiting the time in which a malpractice action may be brought accords with our view:

> The objective of a statutory limitation on the time within which an action may be brought is, in malpractice cases, the protection of medical practitioners from the assertion of stale claims. We do not believe the legislature intended to limit patients asserting malpractice claims, who by the very nature of the treatment had no way of immediately ascertaining their injury, to the same overall period of time that is allowed for bringing other tort actions that are normally immediately ascertainable upon commission of the wrong. The protection of the medical profession from stale claims does not require such a harsh rule. The mischief the statute was intended to remedy was delay in the assertion of a legal right by one who had slumbered for the statutory period during which process was within his reach. * * *

Berry v. Branner, supra, 998–999.

In *Waldman* the Maryland Court of Appeals concluded "that the right of action for injury or damage from malpractice may accrue when the patient knows or should know he has suffered injury or damage." Waldman v. Rohrbaugh, 241 Md. 137, 215 A.2d 825, 830 (1966).

In that opinion it pointed out that "New Jersey and West Virginia have recently, in soul-searching opinions, reversed their prior adherence to the general rule and applied the time of discovery date." Waldman v. Rohrbaugh, supra, 830.

In *Yoshizaki* the Hawaii Supreme Court, as recently as November 1967, after reviewing the approaches of the various courts to this problem and policy conflicts, concluded "that the statute does not begin to run until the plaintiff knew or should have known of the defendant's negligence." Yoshizaki v. Hilo Hospital, Hawaii, 433 P.2d 220, 223 (1967). It stated that its conclusion was consistent with the legislative prescription to avoid constructions which would lead to absurd results. It said the injustice of barring the plaintiff's action before she could reasonably have been aware that she had a claim was patent.

The essence of the causes of action in the appeals before us is that due to the alleged negligent failure of Dr. Lancaster to properly diagnose Mrs. Iverson's ailment she underwent an unnecessary sterilization. It is contended—and the record bears out—that the Iversons did not discover, nor could they by reasonable diligence have discovered, the doctor's alleged negligence until they were informed by him of the coarctation of Mrs. Iverson's aorta and of the remedial effect which would be obtained through corrective surgery. Under these circumstances we hold that the statute of limitations did not commence to run until June 27, 1962, when they were given the information by Dr. Lancaster. Both Mr. and Mrs. Iverson are thus entitled to have their cases tried on their merits.

A certain extension of the rule which we have applied today may be necessary under some circumstances. The following excerpt from Hundley v. St. Francis Hospital, 161 Cal.App.2d 800, 327 P.2d 131, 80 A.L.R.2d 360 (1958), may indicate the direction in which it may be necessary to extend the rule, dependent upon the facts:

The rule is clear, as to malpractice actions, that "while the physician-patient relation continues the plaintiff is not ordinarily put on notice of the negligent conduct of the physician upon whose skill, judgment and advice he continues to rely." Myers v. Stevenson, 125 Cal.App.2d 399, 401–402, 270 P.2d 885, 887. Thus, in the absence of actual discovery of the negligence, the statute does not commence to run during such period (Huysman v. Kirsch, 6 Cal.2d 302, 57 P.2d 908), and this is true even though the condition itself is known to the plaintiff, so long as its negligent cause and its deleterious effect is not discovered (Trombley v. Kolts, 29 Cal. App.2d 699, 85 P.2d 541). * * *

Hundley v. St. Francis Hospital, supra, 135.

We next turn our attention to the specifications of error assigned by the Iversons.

The first three specifications of error assert that the trial court erred in denying the Iversons' motions that they be permitted to examine Drs. Shook, Heilman, and Story as hostile or adverse witnesses. The Iversons named Dr. Lancaster and the Fargo Clinic as parties defendant in their respective actions. In their complaints they asserted that the Fargo Clinic was a corporation organized under the laws of the State of North Dakota, that in the month of July 1957 and prior thereto the corporation held itself out to the plaintiffs and the public in general as a place where persons could obtain medical services in the care and treatment of diseases and injuries to the human body, and that it had specialists in the field of medical practice for such services.

During the trial the Iversons called Mr. C. Warner Litten for cross-examination. He testified that he was secretary-treasurer of the Fargo Clinic, a corporation, and manager of the Fargo Clinic, a partnership. He said the corporation owned the building and the property around it, operated a pharmacy, and leased the building to the partnership, which operated the medical functions within the building itself.

It appears then that neither the employees of the partnership nor its members, other than Dr. Lancaster, were parties defendant.

The pertinent rule reads:

Rule 43. Evidence.
    *    *    *    *    *    *
(b) Scope of Examination and Cross-Examination. A party may interrogate any unwilling or hostile witness by leading questions. A party may call an adverse party or an officer, director, superintendent or managing agent of a public or private corporation or of a partnership or association which is an adverse party, and interrogate him by leading questions

and contradict and impeach him in all respects as if he had been called by the adverse party, and the witness thus called may be contradicted and impeached by or on behalf of the adverse party also, and may be cross-examined by the adverse party only upon the subject matter of his examination in chief.

  \*   \*   \*   \*   \*   \*

North Dakota Rules of Civil Procedure.

Dr. Shook was asked the following questions to establish a basis for examining him as a hostile witness:

MR. SAEFKE [counsel for the Iversons]: Will you state your name, please.

A. Lester D. Shook.

Q. And your occupation or profession?

A. Physician.

Q. And where do you practice?

A. At the Fargo Clinic.

Q. And how long have you been practicing at the Fargo Clinic?

A. Since 1955.

Q. And what is the nature of your practice?

A. Radiology.

Q. And what is your relationship, if any, with the Fargo Clinic? Are you a partner or an employee?

A. I am a partner of the Fargo Clinic.

Q. Partnership—is that right?

A. Partnership.

Q. And were you such a partner in 1957?

A. No, sir.

Q. What was your position in 1957?

A. An employed physician.

Q. By whom?

A. By the Fargo Clinic Partnership.

Q. And were you in the—were you a radiologist at that time?

A. I was.

Q. Do you know Dr. Lancaster?

A. Yes, sir.

Q. Personally?

A. Yes, sir.

Q. You have for a number of years?

A. Yes, sir.

Q. Your Honor, now we would move to be allowed to examine this witness as a hostile witness, having shown that he is clearly aligned with the defendant in this case.

THE COURT: Denied.

The questions asked Dr. Charles Heilman as a basis for examining him as a hostile witness elicited his name, that he was a radiologist, that he had practiced at the Fargo Clinic and St. Luke's Hospital since April 1942, and that he knew Dr. Lancaster personally. After this much of his testimony counsel for the Iversons moved to be allowed to examine him as a hostile witness, and the court denied the motion.

Dr. Robert Story's testimony in response to the questions asked him as a basis for examining him as an adverse witness was that he had been a physician since 1947; that he had practiced at the Fargo Clinic for eleven years and had been in the service for three years; that he knew Dr. Lancaster well; that he worked with Dr. Lancaster as a colleague in the same department; that he was a partner; that Dr. Lancaster had requested a consultation with him in Mrs. Iverson's case and he had accordingly examined her, although he did not do a complete examination; that he thought that examination took place on June 27, 1962; and that he believed he had made a written report or notation of that examination. On the basis of that testimony the court denied the motion to examine him as an adverse witness.

Although the record does not disclose that the Iversons so argued in trial court, on appeal they seem to argue that we must distinguish between what is permissible under the first sentence and what is permissible under the second sentence of rule 43(b). They contend that they should have been permitted under the first sentence to ask leading questions of the doctors because they were associated or aligned with Dr. Lancaster either as partners or employees at the time of diagnosis and treatment of Mrs. Iverson, or that they should have been permitted under the second sentence to interrogate the doctors by leading questions and contradict and impeach them as adverse parties although they were not made defendants.

Recent decisions of the United States Court of Appeals for the 5th Circuit seem to support the Iversons in their contention that a party may be an adverse party although he is not made a party defendant.

In Degelos v. Fidelity & Cas. Co., 313 F.2d 809 (5th Cir. 1963), the court said:

At the outside it bears emphasis to point out that F.R.Civ.P. 43(b) covers two quite distinct things. The first sentence treats with witnesses who are hostile. Limited to a witness who is hostile or unwilling, that sentence likewise specifies the particular procedural remedy accorded. It states plainly that the party placing such a witness on the stand "may interrogate any unwilling or hostile witness by leading questions." This stands in contrast to the next sentence which grants the right to call an adverse party. Not only is this right separately prescribed, but the remedial privileges afforded are quite different and significantly much broader. This includes the right to (a) "interrogate him by leading questions" to (b) "contradict," and (c) "impeach him" the same " * * * in all respects as if he had been called by adverse party * * *." F.R.Civ.P. 43(b).

The right to put leading questions to an unwilling or hostile witness was long recognized and the rule introduced no new principle. But the addition of a specific right to call an adverse witness was new. It brought federal practice in line with the growing number of comparable state statutory provisions or court rules. Likewise, it served as a tangible, meaningful, though severely confined, protest against the long criticized dogma forbidding impeachment of one's own witness. It was a recognition that—as was so here—frequently the whole case not only turns in the end upon what the adversary knew or did, but that adversary is also the sole source of testimonial proof. The rule is an expression of historical experience unaffected by the intrinsic attitudes or relationship of the particular parties to a given suit. Significantly the rule is not stated in terms of a "hostile" or "unwilling" adverse party. The right is extended to any adverse party. (footnotes omitted)

Degelos v. Fidelity & Cas. Co., supra, 814–815.

In *Degelos* the court permitted the plaintiff, in a suit nominally brought against a liability insurer under the Louisiana Direct Action Statute to call the assured as an adverse witness under F.R.Civ.P. 43(b).

We believe, however, that the assured stood in a much different relationship to the plaintiff in that case than the doctors did to the Iversons in the instant appeals.

We quote *Degelos*:

The plaintiff was Mrs. Degelos for herself and a minor daughter. The suit was to recover for damages sustained from injuries to and death of Adolph Degelos (husband and father). He was a passenger in a small foreign Vauxhall owned by a corporation in which he was a substantial stockholder. The Vauxhall was being driven by his son, Lyle Degelos, an officer of the corporation. The company-owned Vauxhall was insured by Fidelity. It is undisputed that Lyle had the standing of an assured under that

policy. In addition he had an individual automobile policy affording some coverage with United Services. The suit, following the Louisiana Direct Action Statute pattern, was therefore brought against Fidelity and United Services. Lyle Degelos was not made a party since this would have destroyed diversity. However, the suit in direct and elaborately precise allegations asserted negligence of Lyle. Recovery depended altogether on the conduct of Lyle as driver of the Vauxhall. (footnotes omitted)

Degelos v. Fidelity & Cas. Co., supra, 812.

■■■ We think it should be especially noted that the court in *Degelos* pointed out that the plaintiffs' recovery depended altogether on the conduct of the driver, who was sought to be called for cross-examination as an adverse witness. In the instant appeals the Iversons' recovery was not dependent on the conduct of the three doctors whom they sought to cross-examine but on the conduct of Dr. Lancaster. In any case, no offer of proof was made to attempt to show that the Iversons' recovery was dependent upon the conduct of the three doctors. In other words, no effort was made to show that they were the tort-feasors.

In a still more recent decision of the 5th Circuit Court of Appeals, the court said:

The distinction between the first sentence of the Rule, which treats of unwilling or hostile witnesses, and the second sentence, dealing with adverse parties and others, was carefully drawn. Under the latter provision, the sole issue is whether the party sought to be called occupies an adverse position to the party seeking to call him. His presumed or actual hostility, or lack thereof, is irrelevant. So also the identity of the named party is irrelevant. The question is whether the party sought to be called could have been sued, either instead of the named defendant or as a co-defendant. If so, and if the witness is an alleged tort-feasor, and if the standard for recovery would be the same whichever were sued, he is an adverse party within the meaning of Rule 43(b). * * *

* * * * * *

In the instant case, Worthy [the witness] was the alleged tort-feasor whose conduct gave rise to the cause of action. The Alabama Power Company will be be liable only if such facts are proved as would be required in order to show liability on the part of Worthy had he been joined or sued alone. Since Worthy was an adverse party within the Rule, it was error for the district court to refuse to allow him to be called as such. * * *

Chumbler v. Alabama Power Company, 362 F.2d 161, 163–164 (5th Cir. 1966).

Here again we note that the court's reason for permitting the witness to be called as an adverse party was that the witness's conduct gave rise to the cause of action, which, as we have previously pointed out, was not the case in the instant appeals.

We accordingly hold that the Iversons were not entitled to examine the three doctors as adverse parties. We must pursue case law further to determine whether they should have been permitted to call the doctors as hostile witnesses under the first sentence of rule 43(b).

The most recent case we have been able to find on this subject is Journeymen Plasterers' Local 5 v. NLRB, 341 F.2d 539 (7th Cir. 1965). In that case the court said:

Pursuant to the provisions of Rule 43 (b), Federal Rules of Civil Procedure, a party may interrogate any unwilling or hostile witness by leading questions. Phillips' testimony indicates that he aligned himself with the interest of the Union insofar as it related to his reasons for discharging Spinelli. He may be characterized as a hostile witness. See Rossano v. Blue Plate Foods, Inc., 314 F.2d 174, 178 (5th Cir. 1963), cert. denied 375 U.S. 866, 84 S.Ct. 139, 11 L.Ed.2d 93. Allowance of impeachment of a party's own witness is within the discretion of

the trier of facts who heard him and saw him testify. United States v. Marks, 274 F.2d 15, 19 (7th Cir. 1959), Stevens v. United States, 256 F.2d 619, 622 (9th Cir. 1958). A hostile witness who surprises the party calling him by testimony contrary to statements made prior to the trial may be impeached. O'Shea v. Jewel Tea Co., Inc., 233 F.2d 530, 535 (7th Cir. 1956).

Journeymen Plasterers' Local 5 v. NLRB, supra, 544.

In *Journeymen Plasterers'* the court found that the circumstances justified a finding of sufficient surprise to permit impeachment of the witness by the use of his extrajudicial statement. The court accordingly found that the record failed to show an abuse of discretion in permitting impeachment of the witness.

In an earlier decision the United States Court of Appeals for the 5th Circuit had this to say:

In the interpretation and construction of the subject Rule, it must be borne in mind that it seeks to remedy at least some of the more strained results of a rigid application of the traditional premise which impels a party to vouch for the credibility and to be bound by the testimony of every witness who testifies at his instigation. This concept, long ingrained in our tribunals, has much to commend it for orderliness of presentation and evolved with the replacement of an inquisitorial to a contentious or adversary system.

The wide acceptance and often highly artificial result of this common law rule has been much criticized by some courts and by most writers in the field of evidence, particularly as it applies to impeachment by use of previous contradictory statements. See the opinion of Judge Learned Hand in DiCarlo v. United States, 6 F.2d 364, 368 (C.A. 2d, 1925) and McCormick on Evidence, 1954 Ed., sec. 38 page 70ff. From such basic and unsophisticated notions it has

for some time been recognized that the truth might not always spill forth from witnesses who are possessed of pertinent information but who also have the interest of one of the opposing parties close to his heart. Here the techniques of cross-examination or impeachment may well be needed to jog the memory or bring into clear focus the full import of testimony often obtainable from no other source. Recognizing this, Rule 43(b) explicitly provides in its first sentence that a party may interrogate *any* unwilling or hostile witness by leading questions, and to this extent plainly states an exception to the ancient rule. There is no specific provision concerning cross-examination of a witness who is not a party, or an officer, director or managing agent of a party, though there is persuasive precedent that the Court may in its discretion allow a party to cross-examine and impeach his own witness if it appears that the witness is hostile. (emphasis by the Court of Appeals)

Before this comes into play, however, a showing must be made that the witness must be considered hostile by reason of clear alignment of interest with the other party or due to antagonism directed to the calling party, either or both to be weighed by the traditional concept of prejudice. (footnotes omitted)

Rossano v. Blue Plate Foods, Inc., 314 F.2d 174, 178 (5th Cir. 1963), cert. denied 375 U.S. 866, 84 S.Ct. 139, 11 L.Ed.2d 93.

■■ Can we say that there was such a showing of clear alignment of interest between the three doctors and Dr. Lancaster or such antagonism directed toward the Iversons, weighed by traditional concepts of prejudice, that we must find that the trial court abused its discretion in failing to permit the Iversons to examine the doctors as hostile witnesses? We think not. Accordingly, we find no error in the trial court's denial of the motions to permit the Iversons to examine the doctors as hostile witnesses.

The third issue we are confronted with is set forth in the Iversons' brief as follows:

Our specifications of error four, five, and six, deal with our right to examine the defendant on medical publications, after he has acknowledged and recognized them as authorities.

The writer of 60 A.L.R.2d 77 summarizes the subject as follows:

It is accepted as a general rule in most jurisdictions that learned treatises of the type herein discussed may not be used as independent evidence of the facts or opinions stated therein, because of the violation of the hearsay rule involved in the fact that the author of the statements in question is not available for cross-examination.

The objection to the use of such material on cross-examination is, of course, that such use in effect places the opinion of the author before the jury in violation of the general rule of exclusion. However, since in the great majority of the cases the testimony of the expert witness draws its authority to a great extent from his status as a student of just such works as the rule excludes, it is deemed unfair to forbid the cross-examiner to attack the expert's opinion by reference to sources the same as or similar to those from which it is drawn.

The liberality of the courts in permitting the cross-examiner to use learned treatises would seem to vary in ratio to the relative weight given these two considerations. Four lines of authority may be distinguished: (1) many cases hold that the cross-examiner may use only those treatises which the expert witness has specifically cited as supporting his opinion; (2) other courts have held that where the expert has relied generally or specifically upon the authorities, he may be attacked upon the basis of authorities which are not necessarily the same as those he has himself used; (3) a third group of cases take the view that the

expert may be examined upon the basis of treatises which he has himself recognized as having authoritative status, whether or not he relied thereon in forming his opinion; while (4), there are many cases recognizing that the cross-examiner may use treatises the authority of which is established in any acceptable manner, to test the qualifications of the witness regardless of whether that witness has relied upon or recognized the treatise.

While the four general lines of authority can be distinguished with considerable confidence, it is only with great hesitancy that it can be said that the courts of any particular jurisdiction will, on the basis of its past record, follow one rule or the other, since the cases are replete with vague dicta on the matter and many reports fail to include any statement as to facts which may have been significant, or to indicate whether facts which are stated were regarded by the court as significant. Most of the jurisdictions which have passed upon the matter at all are represented by cases which support two or more of the suggested rules, and the most that can be said is that there is discernible some trend towards a policy of liberality in permitting the use of treatises.

Whatever the general rule governing the use of treatises by the cross-examiner, it seems clear that the trial court has considerable discretion in controlling their use, and it has frequently been held that where the evident purpose of the cross-examiner was to get the statements of the author before the jury as primary evidence by the subterfuge of using it to attack the expert's testimony, the court may properly act to prevent this. All the cases have assumed that the authoritative status of the treatise used must be established to the satisfaction of the court in some manner or other, although there is little decisional law as to just how this is to be done. And clearly the erroneous action of the trial court in

permitting or forbidding the use of treatises to the cross-examiner will be reversible only where it can be said that prejudice resulted. (footnotes omitted)

Annot., 60 A.L.R.2d 77, 79–81 (1958).

The annotator has categorized North Dakota as having applied the lines of authority numbered (1), (2), and (4).

The decision cited by the annotator as placing North Dakota among those states with the most liberal policy in permitting the use of treatises is that of Kersten v. Great Northern Railway, 28 N.D. 3, 147 N.W. 787 (1914).

In *Kersten* this court said:

The fourth complaint of appellant relates to the cross-examination of defendant's witness Dr. Sihler. The doctor had given his opinion as to the effect upon the brain of a blow delivered directly above the injury. Upon cross-examination, he was asked whether or not certain medical text-books and authorities sustained a doctrine contrary to that held by the witness. It appears that the text-book to which reference was made was offered to the witness, and that the author at that time was a teacher of surgery in Johns Hopkins University. Thus the cross-examination was evidently in good faith to test the accuracy of the conclusion given by the expert who was upon the stand. Great latitude should be allowed in the cross-examination of experts to test their credibility and knowledge. (citations omitted)

We think the cross-examination proper.

Kersten v. Great Northern Railway, supra, 790.

■ With the trend in the courts toward permitting a greater use of treatises in the examination of expert witnesses and the logic which supports such a trend, we believe it is well that we clarify this court's position. We conclude that the approach used by the courts which have followed the fourth line of authority is best. We therefore find that the trial court erred in refusing to permit the Iversons in their cross-examination of Dr. Lancaster to use a treatise written by an authority whom the doctor recognized but had not read or followed in his medical practice.

■ It was not error, however, for the trial court to refuse to permit the Iversons to use an unidentified article from the Journal of the American Medical Association in cross-examination of Dr. Lancaster, when the author was not established as an authority nor recognized by the doctor as an authority, even though the doctor testified that in his practice he generally relied on the Journal. It was not error for the trial court to refuse to permit the Iversons to use an identified article from the Journal of the American Medical Association in cross-examination of Dr. Lancaster in the above situation.

In view of our disposition of other specifications of error in the Iversons' favor, we find it unnecessary to consider their specifications of error Nos. 7 and 9, which deal with the court's alleged prejudicial error in the denial of a motion to strike as not responsive a certain answer of Dr. Lancaster on cross-examination and the court's comments on the evidence.

The fourth issue is that the court erred in sustaining an objection to the plaintiffs' cross-examination of Dr. Lancaster directed toward establishing the standard of skill and care ordinarily exercised by doctors in the community. The record pertinent to this issue reads:

Q. Having practiced in Fargo for all these years, all the years since 1926, until 1965, you were familiar with the normal procedure of doctors in general practice, were you not?

A. Yes, sir.

Q. And is it not true that the normal procedure in the general practice of medicine in your line was to look for all the

causes of any condition that a patient came to you with?

MR. VOGEL [counsel for Dr. Lancaster]: That is objected to on the ground that it calls for an opinion and conclusion of the witness. It is an effort to get a witness to testify as an expert on cross-examination, which is prohibited by the Rindlaub case.

As the trial court sustained the objection to that question on the basis of Hunder v. Rindlaub, 61 N.D. 389, 237 N.W. 915 (1931), and it is upon this opinion that Dr. Lancaster contends the objection should be sustained on appeal, we set forth the pertinent part of that opinion:

> In our opinion section 7870 [C.L.1913] was never intended to permit a party to an action to call an adverse party as an expert, examine him as such under the rules of cross-examination, and yet not be bound by the testimony. Osborn v. Carey, 24 Idaho 158, 132 P. 967. Neither was it intended to change the order of proceedings in an action or reverse the order of proof. Boeck v. Boeck, 29 Idaho 639, 161 P. 576.
>
> We agree with the Supreme Court of Idaho: "The statute was not intended to enable an adverse party to call an opposing party as an expert and seek to establish his side of the case by such expert evidence. Where a witness is called under the provisions of that act, he may be examined by the adverse party as if under cross-examination, subject to the rules applicable to the examination of other witnesses, but it is contrary to the purpose and reason of that statute to allow the plaintiff to make out his case in chief by expert opinion evidence secured from the defendant on cross-examination. If the plaintiff desires to make his case by expert evidence from the defendant himself, he must call him as his own witness, but is not permitted to do so under the provisions of that statute." (citing Osborn)

Hunder v. Rindlaub, supra, 922.

As the ruling in *Hunder* was based on C.L.1913, § 7870, which has now been superseded by N.D.R.Civ.P. 43(b), let us compare the rule with the statute:

> § 7870. Examination adverse party. A party to the record of any civil action or proceeding, or a person for whose immediate benefit such action or proceeding is prosecuted or defended, or the directors, officers, superintendent or managing agents of any corporation which is a party to the record in such action or proceeding, may be examined upon the trial thereof as if under cross-examination at the instance of the adverse party or parties or any of them, and for that purpose may be compelled in the same manner and subject to the same rules for examination as any other witness to testify, but the party calling for such examination shall not be concluded thereby, but may rebut it by counter testimony.

Compiled Laws 1913.

In comparing the rule with the statute we find interesting what the Maryland Court of Appeals in a 1961 decision said, in comparing their rule with our statute and the statutes of three other states which followed the *Hunder* rule:

> The defendant cites cases from at least four jurisdictions holding—under the particular "adverse witness" statutes there involved—that an adverse party may be examined as if he were under cross-examination, but may not be requested to express an opinion based on his expert knowledge. However, the local statutes under consideration in the cases referred to were, without exception, much narrower in scope than the statute * * in this State,[2] and we decline to follow

2. For example, the Ohio statute (now Page's Ohio Revised Code, § 2317.07) involved in the Forthofer case provided that "[a]t the instance of the adverse party, a party may be examined as if under cross-examination * * * like any other witness." The Idaho statute (2 Idaho Code, § 9–1206) under construction in the Osborn case is

substantially the same, as is R.S. 2:97–12, N.J.S.A. 2A:81–11, passed upon in the Hull case. All of these statutes use general language to the effect that the examination shall be in the nature of *cross-examination*, while the Maryland statute, omitting any reference to cross-examination, uses instead the terms "interrogate * * * contradict and impeach." (emphasis by the Maryland court)

the reasons adduced for the conclusions reached in these decisions. (one footnote omitted)

State ex rel. Miles v. Brainin, 224 Md. 156, 167 A.2d 117, 119, 88 A.L.R.2d 1178 (1961).

Our rule 43(b) is similar in language to the Maryland statute.

In adopting the reasoning of the Supreme Court of California in the case of Lawless v. Calaway, 24 Cal.2d 81, 147 P.2d 604 (1944), the Maryland court said:

We think the reasoning in the Lawless case is persuasive. The obvious purpose of "adverse witness" statutes is to permit the production in each case of all pertinent and relevant evidence that is available from the parties to the action. Furthermore, it seems plain that the statute in this State is broad enough to encompass whatever expert knowledge the party called as an adverse witness may possess. That this is the case is further buttressed by the striking similarity between the provisions of our statute and Rule 43(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A. Under that rule, in cases involving pretrial depositions, the federal cases require the deponent to answer questions involving expert testimony. See Russo v. Merck & Co., D.C. R.I.1957, 21 F.R.D. 237 and Broadway & Ninety-Sixth Street Realty Company v. Loews, Inc., D.C.S.D.N.Y.1958, 21 F.R.D. 347.

State ex rel. Miles v. Brainin, supra, 119–120.

The reasoning of the California court adopted by the Maryland court is:

It is equally well settled that expert testimony is ordinarily required to prove the material or relevant issues in an action for malpractice. Neither the letter nor the spirit of the statute suggests any reason why the defendant in such an action should not be examined with regard to the standard of skill and care ordinarily exercised * * * under like circumstances and with respect to whether his conduct conformed thereto. We are of the opinion that such examination should be permitted under [the statute] even though it calls for expert testimony. * * *

Lawless v. Calaway, 24 Cal.2d 81, 147 P.2d 604, 609 (1944).

In light of the evolution that has taken place in procedures since the adoption of the Federal Rules of Civil Procedure by the United States Supreme Court and the adoption by the various state courts of rules of civil procedure patterned on the federal rules, we think it pertinent to review some other decisions of state courts that have considered this question.

In a recent decision the New York Court of Appeals said:

While recognizing the right of a plaintiff in a malpractice action to call as a witness the defendant doctor, the courts of several States have sought to limit the type of questions which the plaintiff may put to him. Specifically, it has been held that a defendant physician may be required to testify to "facts within his knowledge"—that is, "what [he] actually saw and did"—but not as to whether his actions deviated from the accepted standard of medical practice in the community, a matter deemed to call for "expert opinion." (Hull v. Plume, 131 N.J.L. 511, 516–517, 37 A.2d 53; see, also, Osborn v. Carey, 24 Idaho 158, 168, 132 P. 967; Hunder v. Rindlaub, 61 N.D. 389, 406–

410, 237 N.W. 915; Forthofer v. Arnold, 60 Ohio App. 436, 441–442, 21 N.E.2d 869; cf. Ericksen v. Wilson, 266 Minn. 401, 123 N.W.2d 687.) Other courts, however, permit the plaintiff to examine his doctor-opponent as freely and fully as he could any other qualified witness. (See Lawless v. Calaway, 24 Cal.2d 81, 90–91, 147 P.2d 604; State for Use of Miles v. Brainin, 224 Md. 156, 167 A.2d 117, 88 A.L.R.2d 1178; cf. Snyder v. Pantaleo, 143 Conn. 290, 122 A.2d 21.)

The latter decisions strike us as the more enlightened. That the defendant is an "expert" and that the particular questions asked of him are those which only an expert can answer, seem beside the point. It is at least arguable that the doctor's knowledge of the proper medical practice and his possible awareness of his deviation from that standard in the particular case are, in a real sense, as much matters of "fact" as are the diagnosis and examination he made or the treatment upon which he settled. More importantly, however, by allowing the plaintiff to examine the defendant doctor with regard to the standard of skill and care ordinarily exercised by physicians in the community under like circumstances and with regard to whether his conduct conformed thereto, even though such questions call for the expression of an expert opinion, the courts do no more than conform to the obvious purpose underlying the adverse-party-witness rule. That purpose, of course, "is to permit the production in each case of all pertinent and relevant evidence that is available from the parties to the action." * * *

McDermott v. Manhattan Eye, Ear & Throat Hospital, 15 N.Y.2d 20, 255 N.Y. S.2d 65, 71, 203 N.E.2d 469, 473 (1964), quoting State ex rel. Miles v. Brainin, supra.

In a recent decision of the Ohio Supreme Court, after listing the decisions which do not permit a party to elicit expert testimony from his opponent, the court commented:

Those cases do not specify anything inherently wrong with examining the opponent as an expert and are general in their reason for finding that the statute was not intended to include such examination. The real basis seems to be that it would not be fair or sporting to allow the plaintiff to force the defendant to become his expert. (citations omitted)

No question of fairness should be involved in this matter. A person has no right to remain silent if he has information which is needed in a judicial proceeding. Since the withholding of relevant testimony obstructs the administration of justice, the duty to testify is owed to society not to the individual parties. The question is not whether it is fair for a party to require the adverse party to testify but whether it is fair for society to require a party to testify, where his testimony will aid his opponent. (citations omitted)

* * * A civil defendant has no protection against subjecting himself to liability. If his testimony will provide facts which will aid the court in arriving at a just decision, he has duty to testify. Any loss to the sporting aspect of adversary proceedings would be outweighed by the benefit to the judicial system.

Oleksiw v. Weidener, 2 Ohio St.2d 147, 207 N.E.2d 375, 377 (1965).

In a decision rendered only last year by the Michigan Court of Appeals that court reviewed the change that has taken place in the law relating to this issue:

At the time of the trial court's decision (May 1965), the weight of authority prohibited a plaintiff from establishing a malpractice action through cross-examination of the defendant physician. Marrone v. United States (CCA 2, 1966), 355 F.2d 238. The reasoning behind this prohibition is found in the following statement:

"Cross-examination under the rules was not designed to force a defendant

into becoming a plaintiff's expert witness, particularly when the plaintiff is attempting to condemn the expertise of that witness." Ericksen v. Wilson (1963), 266 Minn. 401, 123 N.W.2d 687, 691.

However, subsequent to the decision in *Ericksen,* supra, there has been a decided shift in the weight of authority. In support of its position, *Ericksen* cites two Ohio cases, one New York case, one New Jersey case and one North Dakota case.[3]

3. Forthofer v. Arnold (1938), 60 Ohio App. 436, 21 N.E.2d 869; Wiley v. Wharton (1941), 68 Ohio App. 345, 41 N.E.2d 255; Hull v. Plume (1944), 131 N.J.L. 511, 37 A.2d 53; McDermott v. Manhattan Eye, Ear & Throat Hospital (1962), 16 App.Div.2d 374, 228 N.Y.S. 2d 143; Hunder v. Rindlaub (1931), 61 N.D. 389, 237 N.W. 915.

At this time the North Dakota case represents the present rule only of that state. The remaining states have abandoned their original position and now follow the more "enlightened view," which allows the defendant-doctor's testimony to be utilized as the basis for establishing malpractice. * * *

Dark v. Fetzer, 6 Mich.App. 308, 149 N. W.2d 222, 224 (1967).

Behind the trend away from the rule announced in *Hunder* is the reasoning of Wigmore:

If there is any situation in which any semblance of reason disappears for the application of the rule against impeaching one's own witness, it is when the *opposing party is himself called by the first party,* and is sought to be compelled to disclose under oath that truth which he knows but is naturally unwilling to make known. To say that the first party guar-

antees the opponent's credibility * * * is to mock him with a false formula; he *hopes* that the opponent will speak truly, but he equally perceives the possibilities of the contrary, and he no more guarantees the other's credibility than he guarantees the truth of the other's case and the falsity of his own. To say, furthermore, that the first party, if he could impeach at will, holds the means of improperly coercing the other * * * is to proceed upon a singular interpretation of human nature and experience, and to attribute a power which the former may perhaps wish that he had but certainly cannot be clothed with by this or any other rule. There is therefore no reason why the rule should apply at all. (footnote omitted) (emphasis by Wigmore)

3 J. Wigmore, Evidence § 916, at 431 (3d ed. 1940).

As our analysis of the trend of the law may have indicated, we are now convinced that it is timely and proper, in light of the adoption of N.D.R.Civ.P. 43(b) that our decision in Hunder v. Rindlaub be overruled. We accordingly hold that the trial court erred in refusing to permit the Iversons to cross-examine Dr. Lancaster as an expert.

Because of this error and the other errors we have found to have been committed by the trial court and because they precipitated all other errors specified, we find it unnecessary to consider the additional specifications of error filed by the Iversons. The errors were prejudicial, and we hereby order that the judgments appealed from be reversed. The cases are therefore remanded for new trial.

TEIGEN, C. J., and KNUDSON, PAULSON and STRUTZ, JJ., concur.