Helen **WHEELER** and David Wheeler,
**Plaintiffs and Appellants,**

v.

**SCHMID LABORATORIES,**
**INC., Defendant,**

and

**Dr. Rodney G. Clark, Defendant**
**and Appellee.**

**Civ. No. 890264.**

Supreme Court of North Dakota.

Jan. 25, 1990.

Mack, Moosbrugger, Ohlsen, Dvorak & Carter, Arline F. Schubert (argued), on behalf of Shirley Dvorak, Grand Forks, for plaintiffs and appellants.

Degnan, McElroy, Lamb, Camrud, Maddock & Olson, Ltd., David M. Box (argued), appearance by Patrick J. Maddock, Grand Forks, for defendant and appellee.

ERICKSTAD, Chief Justice.

Helen and David Wheeler appeal from a summary judgment dismissing their medical malpractice claim against Dr. Rodney G. Clark, as barred by the Statute of Limitations. We affirm.

Helen Wheeler consulted with Dr. Clark at the Grand Forks Clinic in 1971 for the purpose of obtaining a method of birth control. After examination and consultation, Dr. Clark recommended the use of the Saf–T–Coil IUD. Late in 1973, Helen began experiencing menstrual problems and consulted Dr. Clark. As a result of Helen's complaints and an examination in January of 1974, Dr. Clark removed the IUD. Dr. Clark noted a cyst on one of Helen's ovaries and advised her that it may have to be removed. Helen consented to an exploratory procedure with a possible removal of an ovarian cyst.[1] The surgery was performed on January 11, 1974.

During surgery Dr. Clark determined, in his clinical judgment, the need for, and did

---

1. Helen Wheeler signed two consent forms, the second of which was also signed by her husband, David Wheeler. Those forms read as follows:

"Mrs. David M. Wheeler # 63–0273 2–0
"United Hospital—Deaconess Unit
"AUTHORIZATION FOR SURGEON
• TO OPERATE
Date *1–8* 1974 Time *5:15* a.m. p.m.
"This is to certify that the surgical procedure known as *Exploratory laparotomy Tubal ligation (Name of Operation)*, the reasons why it is considered necessary, its advantages and possible complications, as well as possible alternative modes of treatment have been explained to me by *Dr. R. Clark (Name of Physician or Surgeon)*, and in light of that information the undersigned authorizes *Dr. R. Clark (Name of Surgeon)* to perform, under any anesthetic deemed advisable, the operation stated above and also to perform such additional procedures as may be held to be therapeutically necessary on the basis of findings

in the course of the operation. Any tissues surgically removed may be disposed of by the surgeon or the hospital in accordance with their accustomed practice."
"AUTHORIZATION FOR SURGEON
TO OPERATE
THE UNITED HOSPITAL
GRAND FORKS, NORTH DAKOTA
"This is to certify that the surgical procedure [illegible] *Exploratory possible removal of ovarian cyst (Name of Operation)* the reasons why it is considered necessary, its advantages, and possible complications, as well as other possible alternative modes of treatment have been explained to me by Dr. *Clark (Name of Physician or Surgeon).*
"In the light of that information, the undersigned authorizes *Dr. Clark (Name of Surgeon)* to perform, under any anesthetic deemed advisable, with the exception of _____, the operation stated above, and also to perform such additional procedures as may be

surgically remove both ovaries, the fallopian tubes, and the uterus. Following surgery, Dr. Clark informed Helen of the extent of the surgery performed. Dr. Clark also prescribed Premarin, an artificial estrogen used to replace the estrogen normally produced by the ovaries, for Helen. Helen's prescriptions for Premarin were periodically renewed through the Grand Forks Clinic from the time of her discharge in 1974 until October 24, 1985. Dr. Clark personally examined Helen only once after 1974, a routine examination on December 13, 1978. Helen's last visit to the Grand Forks Clinic was March 16, 1982, wherein she was routinely examined by Nurse Practitioner Oleen Sveen.

A Summons and Complaint was filed in the District Court for Grand Forks County on August 7, 1986, alleging that the IUD recommended by Dr. Clark, which was manufactured by Schmid Laboratories, was unsafe, defective, and unreasonably dangerous.[2] The complaint also alleged that Dr. Clark carelessly and negligently failed to diagnose her illness and carelessly and negligently advised her to continue using the IUD. Helen alleged that as a result of the use of the unsafe IUD and the subsequent surgery, she is permanently sterile. David Wheeler alleged that he has been deprived, and will in the future continue to be deprived, of the services, aid, comfort, and society of his wife.

The Wheelers made a motion to amend the complaint on September 24, 1987. The proposed amended complaint alleged that Dr. Clark carelessly and negligently failed to properly diagnose her medical condition; that Helen had not given her informed consent to the removal of her ovaries, fallopian tubes, and uterus; that the removal of such organs was unnecessary; and that Dr. Clark fraudulently concealed his negligence.

On April 8, 1989, Dr. Clark made a motion for summary judgment or, in the alternative, for dismissal based upon the Statute of Limitations.[3] Oral argument was heard on the motion on April 24, 1989. In a Memorandum Decision dated July 14, 1989, and an order dated July 31, 1989, the district court granted Dr. Clark's motion for summary judgment and determined that the pending motion to amend the complaint was moot and therefore denied. Judgment of dismissal of the complaint was entered on August 1, 1989. Although Judge Smith denied the motion to amend the complaint, it seems that he considered the issues raised by the motion and we have also done so on this appeal.

The Wheelers served and filed their Notice of Appeal to this Court on August 15, 1989. They appealed from a "decree of the Northeast Central District Court, in Grand Forks County, North Dakota in the above-styled cause entered on the 14th day of July, 1989, which granted summary judgment for Defendants."[4]

surgically necessary on the basis of findings in the course of the operation. I further authorize the taking of pictures or observation of the treatment, procedures or operation for educational or research reasons and the disposal of any surgically removed tissues or member in accordance with the accepted practice of The United Hospital."

2. The case was removed to Federal District Court, District of North Dakota, upon petition for removal by Schmid Laboratories, a foreign corporation. Schmid Laboratories was subsequently dismissed by stipulation and the case was remanded back to state court for lack of diversity jurisdiction.

3. Rule 12(c), N.D.R.Civ.P., provides that: "After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings. If, on a motion for judgment on the pleadings,

matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56."
As matters outside the pleadings were presented and relied on by the court, we will address Rule 56.

4. Dr. Clark has moved to dismiss the appeal, asserting that the Wheelers have attempted to appeal from a non-appealable "decree" or memorandum decision. Although the memorandum decision itself is not appealable, we have held that an attempted appeal from an order or memorandum decision will be treated as an appeal from a subsequently entered consistent judgment, if one exists. *Dickinson Public School Dist. v. Sanstead*, 425 N.W.2d 906, 908

Summary judgment is a procedure for promptly and expeditiously disposing of a controversy without a trial if there is no dispute as to any material fact or the inferences to be drawn from undisputed facts or when only a question of law is involved. *Adams v. Canterra Petroleum, Inc.*, 439 N.W.2d 540, 542 (N.D.1989). A movant for summary judgment has the initial burden of showing that there is no dispute as to a "material" fact. Rule 56(e) of the North Dakota Rules provides in pertinent part that:

> "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him."

On appeal from a summary judgment, the evidence is viewed in a light most favorable to the party against whom the summary judgment was granted. *Adams, supra* at 542; *Thiele v. Lindquist & Vennum*, 404 N.W.2d 52, 53–54 (N.D.1987). The Wheelers assert that the full hysterectomy was not a medically necessary procedure. They argue that this is a disputed material fact and support their view with the affidavit of Dr. Jeffrey P. Block. The district court found nothing in Dr. Block's affidavit which raised an issue of material fact. The Honorable Kirk Smith, in his Memorandum Decision on Motion for Summary Judgment, stated:

> "Dr. Block posits that the discovery of an unsuspected ectopic pregnancy on the right side and cysts on both ovaries by Dr. Clark did not necessitate the total hysterectomy because the cysts 'in all likelihood, would have resolved on their own once the pregnancy was terminated.' Block Dep. p. 2, 1, 14. The consent forms signed by Mrs. Wheeler authorized

exploratory and such further surgery as was 'therapeutically necessary' or 'surgically necessary.' (Defendant's Exhibit No. 21.) Dr. Block gives as his opinion that the consent forms gave no permission for surgery to remove both ovaries and her uterus. (Block Dep. p. 2, 1.22.) No statement as to a prevailing medical standard as to when removal of these reproductive organs may be considered therapeutically or medically necessary has been put forth by either of the parties.

> "So it is the opinion of Plaintiff's expert who examined the medical records against the opinion of Dr. Clark who saw the conditions within Plaintiff's body under surgery. Dr. Clark's post-operative opinion is supported by the pathological report. Report of UND Medical School Pathology Laboratory # 0–74–416, 1–14–74, Ex. 14. There is no such objective support for Dr. Block's opinion. Facts are the grist of a summary judgment action. Opinions however learned, are not of themselves 'facts'. It is only when opinions are based upon other evidence in the case that they can create a genuine issue of material *fact* that would bar the granting of a summary judgment. Therefore, the bare medical opinion of Dr. Block as to the probability that the growths found by Dr. Clark on Plaintiff's fallopian tubes and uterus would disappear by themselves following removal of her ectopic pregnancy does not raise a 'fact issue' as would bar Defendant's motion for summary judgment."

From our review of the record in the light most favorable to the Wheelers, we could conclude that they produced no evidence from which a reasonable inference could be drawn that the surgery was "unnecessary" pursuant to the prevailing medical standard in 1974. Relative to this issue, the Wheelers failed to show that there is a genuine issue of material fact for trial. Rule 56(e), N.D.R.Civ.P.

(N.D.1988); *Vanderhoff v. Gravel Products, Inc.,* 404 N.W.2d 485, 488 (N.D.1987). The subsequently entered judgment in this case is consistent with the order, and we therefore treat the appeal as being from the judgment. Although the Notice of Appeal is not a model for future appellants, we hold that it is sufficient.

The Wheelers also contend that the trial court erred in granting Dr. Clark's motion for summary judgment by failing to apply the continual treatment rule to toll the Statute of Limitations, and in the alternative, the trial court erred in failing to toll the Statute of Limitations because of fraudulent concealment.

■ Medical malpractice actions must be commenced within two years of the discovery of the act or omission of alleged malpractice. Section 28–01–18(3), N.D. C.C.[5] This limitation begins to run when the plaintiff knows, or with reasonable diligence should know, of (1) the injury, (2) its cause, and (3) the defendant's possible negligence. *Froysland v. Altenburg*, 439 N.W.2d 797, 798 (N.D.1989); *Wall v. Lewis*, 393 N.W.2d 758, 761 (N.D.1986) (legal malpractice case). In no case, except where there is fraudulent concealment, will "the limitation of an action … be extended beyond six years of the act or omission of alleged malpractice by a nondiscovery thereof." Section 28–01–18, N.D.C.C.; *See Anderson v. Shook*, 333 N.W.2d 708 (N.D. 1983). This "discovery" rule as to when the limitation period commences to run against a malpractice action was adopted by this Court in *Iverson v. Lancaster*, 158 N.W.2d 507 (N.D.1968).[6] We have interpreted the knowledge requirement to be an objective standard, not a subjective one:

> "Thus, the focus is upon whether the plaintiff has been apprised of facts which would place a reasonable person on notice that a potential claim exists. It is not necessary that the plaintiff be subjectively convinced that he has been injured

and that the injury was caused by the defendant's negligence."
*Wall, supra* at 761.

The malpractice plaintiff's knowledge is ordinarily a fact question which is inappropriate for summary judgment, *Wall, supra* at 761, but the issue becomes one of law if the evidence is such that reasonable minds could draw but one conclusion. *See Belgarde v. Rosenau*, 388 N.W.2d 129, 130 (N.D.1986).

■ The Wheelers knew or, with reasonable diligence, should have known at the time of the surgery that Helen's injury was caused by the use of the IUD and of Dr. Clark's possible negligence in recommending its use. The Wheelers then had ample time to file their complaint within two years after the surgery. Discovery requires the exercise of reasonable diligence. *Froysland, supra* at 798. Even if they could not have discovered the injury or the cause at the time of the surgery, their suit is barred by the six-year "outer limit," unless there was fraudulent concealment on the part of Dr. Clark. *See Black v. Littlejohn*, 325 S.E.2d 469 (N.C.1985).

■ The Wheelers argue that the continuous treatment rule tolled the Statute of Limitations, and therefore, neither the two-year nor the six-year limitation began to run until 1985 when Dr. Clark's treatment of Helen allegedly ended. We have recently discussed the continuing treatment or continuing care rule in its application to malpractice actions in *Froysland v. Altenburg, supra*. In *Froysland*, we said:

> "There are two branches of the continuing care idea: one of continuous treatment for medical malpractice and

**5.** The relevant part of section 28–01–18, N.D. C.C., reads:

"*Actions having two-year limitations.* The following actions must be commenced within two years after the claim for relief has accrued:

\*　\*　\*　\*　\*　\*

3. An action for the recovery of damages resulting from malpractice; provided, however, that the limitation of an action against a physician or licensed hospital will not be extended beyond six years of the act or omission of alleged malpractice by a nondiscovery

thereof unless discovery was prevented by the fraudulent conduct of the physician or licensed hospital. This limitation is subject to the provisions of section 28–01–25."

**6.** In our original adoption of the "discovery" rule, we had no time limitation as to when the suit must be brought. The North Dakota Legislature, however, placed a six-year maximum limit upon the bringing of a medical malpractice action, except where there is fraudulent concealment. 1975 N.D.Sess.Laws Ch. 284, section 1.

another of continuous representation for legal malpractice....

\*　\*　\*　\*　\*　\*

"Although the continuous representation rule originated as an adaptation of the continuous treatment rule, we have only applied the idea to legal malpractice so far."

*Froysland*, 439 N.W.2d at 799.

The continuing treatment concept is premised upon an ongoing and continuous relationship between patient and physician. The reasons underlying the rule are that a patient must trust a physician to remain in his care and that during that care, the patient is not likely to suspect negligent treatment. It is the trust relationship that may make discovery of a claim difficult. The Minnesota Court of Appeals has summarized the appropriate factors for determining when treatment ends:

"(1) whether there is a relationship between physician and patient with regard to the illness; (2) whether the physician is attending and examining the patient; and (3) whether there is something more to be done."

*Krause v. Farber*, 379 N.W.2d 93, 96 (Minn.App.1985).

Dr. Clark has had only one personal contact with Helen since the surgery in 1974. That was a routine examination on December 13, 1978. The Wheelers contend that Dr. Clark's continual prescription of Premarin for Helen constitutes continuous treatment. An Appellate Division of the New York Supreme Court recently held the continuous treatment doctrine to be inapplicable where the patient is relying solely upon his continued use of a medication long after the last contact with the physician who prescribed it. *Parrott v. Rand*, 126 A.D.2d 621, 511 N.Y.S.2d 57 (A.D. 2 Dept. 1987). As a principle, continuous treatment anticipates ·something more than an isolated act of added attention by the physician more than two years after the initial conduct charged as injurious. *Froysland*, *supra* at 800.

In *Froysland*, the plaintiff appealed from a summary judgment dismissing his medical malpractice claims as being time-barred by the two-year statute limiting malpractice claims. *See* section 28–01–18, N.D.C.C. Froysland had open-heart surgery on August 24, 1983. Afterwards, he suffered from pain and numbness in his right arm and hand from compression of his ulnar nerve. On October 5, 1985, Froysland had surgery on his right arm for the ulnar nerve complication. Dr. Altenburg was the anesthesiologist for both surgeries. On November 18, 1986, Froysland sued Dr. Altenburg [7] and the Fargo Clinic. He claimed that, as the anesthesiologist for his heart surgery, Dr. Altenburg had negligently caused his injury.

On appeal from the summary judgment, Froysland contended that because Altenburg was the anesthesiologist for both surgeries, the Statute of Limitations was tolled by the continuing care concept until after the second surgery. Affirming the dismissal we said:

"Froysland had no follow-up care from Altenburg after the first surgery. There was no ongoing relationship with Altenburg and no contact of any kind with him for over two years. Anesthesia for Froysland's second surgery was coincidental and not part of a continuing pattern of care begun in 1983. Froysland was not lulled into 'sleeping on his rights' by any ongoing connection with Altenburg. The statute for the first surgery had run its course and the claim was time-barred. The second surgery did not revive a claim whose time had expired.

\*　\*　\*　\*　\*　\*

"Were we to adopt the continuous treatment theory in North Dakota, Froysland's claim would clearly be outside the rule."

*Froysland* at 800–01.

Similarly, Helen had not been personally examined by Dr. Clark since 1978. We do

---

**7.** Froysland's malpractice suit against the surgeon for the heart surgery was dismissed by summary judgment as being barred by the Statute of Limitations. We summarily affirmed under N.D.R.App.P. 35.1(a)(6) and (7). *Froysland v. St. Luke's Hospitals*, 408 N.W.2d 742 (N.D. 1987).

not believe that a continued prescription for medication eight years after the last personal contact with the doctor constitutes continuous treatment, nor do we believe the routine examination by Nurse Practitioner Oleen Sveen constitutes such treatment. Were we to adopt the continuous treatment theory in North Dakota, the Wheeler's claim would clearly be outside the rule. Incidentally, when we adopted the discovery rule in 1968, we selected it from four possible events which might start the running of Statutes of Limitation. *Iverson v. Lancaster*, 158 N.W.2d at 510.[8]

■ The Wheelers also contend that their claim should not be barred due to Dr. Clark's fraudulent concealment. They assert that because of the confidential and fiduciary relationship between Helen and Dr. Clark, Dr. Clark had a duty to disclose all the material facts and relevant information in regard to the surgery he was to perform on Helen. Dr. Clark told Helen that the surgery was being performed to remove an ovarian cyst or cysts. Helen, however, signed two consent forms giving her authorization for necessary additional surgery. Helen also conceded, in a deposition, that she had consented to more extensive surgery if it was necessary. That testimony was as follows:

"Q. What did Dr. Clark recommend?

"A. Surgery.

"Q. Did he tell you what kind of surgery that was to be?

"A. Just informed me that hopefully they would be able to just cut the tumor off without destroying or hurting anything else, but I had to sign the paper that said if necessary they would do, you know, all the repair work that was necessary.

"Q. Other words, that if it was worse than what he had originally opinioned, that he had your permission to do more extensive surgery?

"A. Yes. Right."

Following the surgery, Dr. Clark informed Helen as to exactly what had been done.

In an affidavit, Dr. Jeffrey P. Block states his opinion that "such surgery was not a medically necessary procedure, and the consent forms do not include permission for such surgery." Dr. Block's opinion was given in 1987, thirteen years after the surgery. There is nothing in the record to indicate whether or not the surgery would have been considered "medically necessary" in 1974. More importantly, however, there is nothing in the record to indicate that Dr. Clark knew or that a person of his specialty should have known that the extensiveness of the surgery was not "medically necessary at that time in medical history."

Because the record is devoid of any fraudulent concealment on the part of Dr. Clark, we find that the Statute of Limitations was not tolled for that reason or for any other herein discussed. Accordingly, the Wheeler claims are barred by the Statute of Limitations.

We affirm.

VANDE WALLE and GIERKE, JJ., concur.

VERNON R. PEDERSON, Surrogate Justice sitting in place of LEVINE, J., disqualified.

---

8. In *Iverson,* we said:
"There is, theoretically, a choice as to the event which starts limitations running against a malpractice action; the period may commence to run when a practitioner's wrongful act or omission occurred, or when such act or omission resulted in injury, or when the injury was, or by the exercise of reasonable diligence should have been, discovered, or, in the case of continuing treatment by the practitioner, when the treatment terminated.
\*　\*　\*　\*　\*　\*
"Annot., 80 A.L.R.2d 368, 373 (1961).

"After studying the various approaches taken by the courts, the recent trend of decisions to depart from the 'general rule,' the indefinite language of our statute, and our belief that justice is best served when claims are adjudicated on their merits, we conclude that the best rule is that the limitation period commences to run against a malpractice action from the time the act of malpractice with resulting injury is, or by reasonable diligence could be, discovered."
*Iverson v. Lancaster,* 158 N.W.2d at 510.

VANDE WALLE, Justice, specially concurring.

I do not believe that a difference in professional opinion on the necessity for surgery can, as a matter of law, rise to the status of fraud sufficient to toll the statute of limitations. Absent fraud prohibiting discovery, NDCC § 28–01–18 establishes a maximum of six years from the time of the act of alleged malpractice within which the action must be commenced, regardless of whether or not the plaintiff has discovered malpractice. This action was commenced more than six years from the time of the alleged act of malpractice. Therefore, whether or not Wheeler should have known that the surgery was unnecessary before an expert told her so is immaterial. I concur in the majority opinion.

MESCHKE, Justice, dissenting.

I respectfully dissent.

In his affidavit, Mrs. Wheeler's medical expert, Dr. Jeffrey P. Block, pointed out that "Mrs. Wheeler's medical records do not contain any consent for a hysterectomy and removal of the ovaries and fallopian tubes." Dr. Block opined "such surgery was not a medically necessary procedure." There is clearly a genuine issue of material fact as to consent and malpractice. N.D.R. Civ.P. 56(c). It is improper to assess the weight of the evidence on a motion for summary judgment as the trial court did and as the majority opinion compounds.

In my opinion, it is a question of fact whether Wheeler knew or should have known that the extensive surgery was "unnecessary" before an expert told her so. *See Black v. Littlejohn,* 312 N.C. 626, 325 S.E.2d 469 (1985). Until she discovered that the surgery may have been unnecessary, it is difficult to see how the statute of limitations could begin to run.

Dr. Clark made post-operative representations to Mrs. Wheeler that surgical removal of her ovaries, the fallopian tubes, and her uterus were necessary, even though her signed consent did not anticipate such extensive surgery. Whether or not those representations were fraudulent concealment is also a factual inference. If,

in fact, extensive surgery was unnecessary, contrary to the representations, that circumstance would certainly permit an inference of fraudulent concealment. 51 Am.Jur.2d *Limitation of Actions* § 149, p. 722 (1970). Where there is an expert opinion that extensive surgery without an express consent was unnecessary, fraudulent concealment should be an issue of fact, not summarily decided as a matter of law.

The issue of continuing treatment, sufficient to toll the six year statute of limitations between the 1974 operation and this 1986 suit, combines factual and legal aspects since we have not yet squarely adopted the doctrine as a principle of law in North Dakota. However, in my opinion, our legal decision may well turn on factual inferences to be made from the course of treatment. Therefore, I would prefer to address that legal issue after those factual inferences are developed by trial.

Whether or not continued prescription of medication eight years after the last personal contact by the physician created a relationship of trust and confidence should be factually determined, particularly when the continued attention affected a condition caused by the surgery claimed to be unconsented and unnecessary. The doctor's responsibility for his office staff and for his prescriptions could be fully developed in the evidence and tested by cross-examination. These circumstances are factually interwoven with the factual issue on fraudulent concealment, as well, and could easily be submitted to a jury in a special verdict form.

I would reverse.

VERNON R. PEDERSON, Surrogate Justice, concurs.